## ROGERS v. WILLOUGHBY et al.

(Court of Appeals of District of Columbia. Submitted May 13, 1924. Decided October 6, 1924.)

### No. 1662.

1. Patents ⊙⟶91 (4)—Evidence held to prove that prior patentee conceived invention before appellants reduced it to practice and was not lacking in diligence.

In interference proceeding involving invention of special kind of loop antennæ, designed for vessels of metal and particularly for submarines, evidence held to prove prior conception of invention by prior patentee, reduction to practice, diligence of prior patentee, and lack of invention by applicants.

2. Patents ⊙⟶90(5)—Inventor held not bound to make tests under actual service conditions.

Inventor of special kind of loop antennæ, designed for vessels of metal and particularly for submarines, held not required to make tests under actual service conditions, but could make test on simulated submarine.

3. Patents ⊙⟶90(5)—Rule as to necessity of making test under service conditions or on utility in practical use stated.

The rule that, to constitute reduction to practice, the test must be made under service conditions or on an instrumentality or utility in practical use, does not apply where it is impossible for the inventor to make his tests under service conditions, or where because of government control, or the pledges to the gov-

ernment of his representative enrolled in the navy, the inventor is denied information as to the experiments actually made, in view of Act March 3, 1883 (Comp. St. § 9441).

Appeal from Commissioner of Patents.

Interference proceeding between James Harris Rogers and John A. Willoughby and another. From a decision of the Commissioner of Patents, awarding patent to the latter, the former appeals. Reversed.

J. Austin Stone, James S. Easby-Smith, and J. Hanson Boyden, all of Washington, D. C., for appellant.

Edward G. Curtis, of New York City, and Harry E. Knight, of Washington, D. C., for appellees.

Before ROBB and VAN ORSDEL, Associate Justices, and SMITH, Judge of the United States Court of Customs Appeals.

SMITH, Judge. This is an appeal from a decision of the Commissioner of Patents awarding a patent to Willoughby and Lowell for a special kind of loop antennæ designed for vessels of metal and particularly for submarines.

The interference in this case was declared on the following claims taken from patent No. 1,303,709, issued to James Harris Rogers on May 13, 1919, and copied by Willoughby and Lowell in the application filed by them for a patent on October 31, 1919:

"1. The combination with a vessel of a radio conductor extending longitudinally thereof but insulated therefrom and from the water except at its ends which make electrical connection with the vessel, an electrical connection between said ends of the radio conductor through said vessel, and electromagnetic signaling instruments associated with said radio conductor at a point between its ends.

"2. The combination with a submarine vessel having a metallic hull of an insulated radio conductor extending longitudinally thereof and connected electrically at its ends with said hull, whereby a loop oscillating circuit is provided, and electromagnetic signaling instruments associated with said looped oscillating circuit.

"3. The combination with a submarine vessel having a metallic hull of an insulated radio conductor extending longitudinally thereof and connected electrically at its ends with said hull, whereby a loop oscillating circuit is provided, a tuning condenser in said oscillating circuit, and electromagnetic signaling instruments associated with said looped oscillating circuit.

"4. The combination with a submarine vessel having a metallic hull of an insulated radio conductor extending longitudinally thereof and connected electrically at its ends with said hull, whereby a loop oscillating circuit is provided, electromagnetic signal instruments associated with said radio conductor between its ends, and a tuning condenser in circuit with said conductor."

On the record and evidence submitted in the interference proceedings, the Examiner of Interferences found, first, that Rogers was the first to conceive the invention; second, that Rogers disclosed the invention to Lyon, and that Lyon upon the suggestion of Rogers tested the invention on a submarine at Key West in March, 1918; third, that the test made by Lyon was not a success, and must be regarded as an abandoned experiment, and not a reduction to practice; fourth, that the experiments on a simulated submarine, even if the use of the loop condenser had been established, did not constitute a reduction to practice for the reason that it was impossible to tell just what part of the signals received were due to the coils in the laboratory, and just what part came over the loop; fifth, that there was no evidence in the record showing that Willoughby and Lowell conceived the specific device of the issue prior to June 5, 1918, which device is represented by Figure 5 of their application; sixth, that as Willoughby and Lowell testified that they were joint inventors that relation must be considered as fairly established; seventh, that Willoughby and Lowell having proven beyond a reasonable doubt that the invention in issue was reduced to practice on June 5(?), 1918, and prior to Rogers' filing date, the prima facie presumption attaching to Roger's patent was overcome, and that the burden of proving that Rogers was entitled to a patent, and that Willoughby and Lowell were not, devolved on Rogers.

The Board of Examiners, on appeal to it, expressly found, first, that the invention was communicated by Rogers to Lyon between February and April, 1918 (the Board made no finding as to the date of conception by Willoughby and Lowell and held that it was not material whether Willoughby be given the date of April 26 or June 20, 1918, for conception and reduction to practice); second, that the test made by Lyon at Key West of the invention of antennæ grounded to the bow and stern of a submarine was not a success, and that for that reason, and for the additional reason that the test was made while the submarine was not submerged, the test was not a reduction to prac-

tice; third, that from April to December, 1918, Rogers was not active in making tests of his invention under service conditions and that he was not diligent in filing his application for a patent; fourth, that Willoughby and Lowell were joint inventors.

The Commissioner, on appeal to him, held, first, that the evidence did not establish that Rogers' conception of the invention was prior to that of Willoughby and Lowell, and did not prove that Rogers disclosed his invention to Lyon or to any one else prior to the date of conception by Willoughby and Lowell; second, that the tests of the invention made by Lyon were not made at Rogers' request, or because of the disclosure by Rogers to Lyon; third, that to reduce the invention to practice it was necessary to test it on a submarine submerged, and that the test made by Lyon at Key West in March, 1918, was not a reduction to practice, but an abandoned experiment; fourth, that Rogers was lacking in diligence, and did not actually or constructively reduce his invention to practice until after Willoughby and Lowell had entered the field.

It appears from the evidence submitted in the interference proceeding that Rogers is a man well advanced in years and a scientist, who from youth to old age has devoted himself to electrical research and the study of electrical phenomena. As early as 1908, Rogers entertained the theory that messages and signals could be sent and received by means of ground antennæ and by actual tests made in that year, established that they could be so sent and received. The messages and signals received by ground antennæ were, however, weaker than those carried by elevated antennæ, and Rogers thereafter made only occasional tests of his discovery until the World War brought him to the realization that it might be used with good results in dugouts, on submarines, and as a valuable adjunct to coast defense. Incited by that realization, he actively resumed his experiments with ground antennæ and made arrangements with Harry H. Lyon, a young man 19 years of age, to assist him in making the necessary tests. The tests of Rogers and Lyon proved the practicability and utility of ground antennæ and on an application filed by them November 10, 1916, joint patent No. 1,220,005 was issued to them on March 20, 1917, for the wireless transmission and reception of messages and signals by means of underground antennæ insulated substantially throughout their length.

Having developed the practicability and utility of insulated underground antennæ, Rogers and Lyon then proceeded to test the efficiency of uninsulated antennæ, whether laid underground or under water on the bottom or above the bottom and beneath the surface of the water. A test was also made with insulated wires laid on the bottom of a lake, and communication was established between the lake and Rogers' home at his laboratory. This last test was repeated for the information of navy experts, and for the purpose of showing that such a system could be used on submarines.

An application for a patent for a wireless system for signaling by electromagnetic waves comprising antennæ under the surface of the earth and in intimate contact therewith, and for antennæ on a boat or vessel, such antennæ being laid parallel to and under the surface of the water and in contact therewith, was filed by Rogers and Lyon November 10, 1916, and patent No. 1,322,622, was issued to them November 25, 1919. Neither of these patents is involved in the interference proceeding here under review, and their history, conception, and claims are simply recited in aid of a better understanding of other evidence in the case.

Investigations, tests, experiments, and studies which made the issuance of those patents possible naturally excited the earnest interest of the Navy, then bending its energies to check the operations of enemy submarines. The department expressly agreed to afford to the inventors such facilities for tests and experiments with their systems as might be feasible and practicable without interfering with the transaction of government business.

In the contracts with the Navy it was further agreed that the inventors would *keep secret and consider as strictly confidential* all knowledge, information, and data concerning said inventions, except such information as had been already disclosed by the issuance of patent No. 1,220,005. It was further agreed that the inventors *would not cause to be issued to themselves, or either of them, or to any individual, combination of individuals, firm, partnership, corporation, municipality, state, or nation, letters patent on said invention or any part thereof.*

Immediately after the execution of that contract Commander Hooper, U. S. N., requested Rogers to go to New Orleans for the purpose of testing antennæ. Rogers was unable to go, but made arrangements with Lyon to go in his place. However, before Lyon would be permitted to make any

experiments or install antennæ on submarines, he was required to enroll in the Navy and thereby became subject to the orders and control of that department. In consequence of Lyon's relation to the Navy, he made secret reports of his tests to the Navy, and Rogers found himself unable to secure such reports. The handicap of that condition on Rogers was not lightened by the resentment which Lyon, shortly after leaving New Orleans, developed when Rogers demanded repayment of moneys advanced by himself and brother to Lyon, a resentment, by the way, which became much accentuated when Lyon learned that the patent attacked by the interference proceedings under review had been issued to Rogers, and not Rogers and Lyon as joint inventors.

Not later than the 17th of March, 1917, Rogers testifies that he conceived by himself the idea of electrically connecting an aerial with the bow and stern of a submarine, and made sketches in a loose-leaf notebook which clearly disclosed that conception. It is apparent, from an examination of that book, that the sketch was originally dated March, and that by converting into a "y" the "r" of the abbreviation "Mar," the date was made to read "May." Rogers positively declared under oath that he did not alter the date, and that the sketch was made in March is confirmed by an entry in Fleishman's book of accounts, which shows that the cash payment of $20 entered in the loose-leaf notebook was made in March. In view of that corroborative evidence, and of the fact that the book was out of Rogers' possession for a time, and of the further fact that the change was not to Rogers' interest, we are of the opinion that he did not make the change, and that entry of the sketch was made in March, and not in May. Because the date in the notebook actually read "May," instead of "March," Rogers instructed his attorneys to give the other side the advantage of the later date in the original preliminary statement.

Lyon was on duty in New Orleans from March to June, 1917, and during that period Rogers says that with one exception, in March, 1917, he wrote daily to Lyon concerning tests on submarines, and communicated to him every idea which Rogers thought would probably make a practical success of underground and underwater antennæ and of radio communication on submarines. Rogers testified that he believed, but that he was unwilling to swear positively, that he gave written instructions to Lyon at New Orleans to use the identical ideas involved in the interference. In this connection it is worthy of note that Rogers' letter of April 1, 1917, which should have contained the sketch entered on page 17 of his notebook under date of March 31st, was not furnished on his demand for letters sent to Lyon, whereas the letter containing the sketch of four wires abreast set out on the very next used page of the notebook was produced. That daily letters were written by Rogers up to April 7, 1917, appears from Lyon's letter to Rogers dated April 10th. The record shows, and the Examiner finds, that all of those letters were not produced by Lyon in response to the demand for their production. Rogers was positive, however, that while Lyon was on his way to New London from New Orleans he was told by Rogers to make tests not only of a multiple turn loop, but also of an aerial having the specific features involved in the interference. Lyon arrived in New London in July, 1917, and remained there until January, 1918. Lyon, testifying for Willoughby and Lowell, and obeying the instructions of their counsel, refused to answer a question put to him on cross-examination as to transmitting tests of antennæ extending fore and aft from the conning tower of the submarine E–1. The question was proper, and should have been answered. The refusal to answer it must therefore be regarded as admitting that the answer, if given, would have been unfavorable to Willoughby and Lowell.

Lyon was in Key West from February, 1918, to April, 1918. According to Rogers, he wrote to Lyon at that place and requested him to try out the antennæ in issue. Lyon afterwards informed Rogers that he had received his letter and had complied with his request to install it upon a submarine. Lyon told Rogers that signals were received from the installation when the submarine was above water, but that when it was submerged he was unable to get anything, and that he would have made a success of the installation if he had been provided with a proper receiver, instead of a dilapidated instrument.

Leonard Wilson, who represented both Rogers and Lyon in negotiations looking to the sale or exploitation of their basic patents for underground and underwater radio, testified that Lyon stated on September 5, 1920, in his presence and that of Rogers and Spencer B. Prentiss, that before he went to New Orleans the device in inter-

ference had been discussed between himself and Rogers. Lyon declined, however, to be a witness for Rogers in the interference proceedings, on the ground that, although Lyon was not the inventor of the device in issue, the government would claim that he *was* the inventor and his testimony might injure rather than help Rogers. On November 18, 1920, Lyon wrote a letter to Wilson, which contained the following statement:

"The work done by Rogers and myself included an antenna system which we sometimes employed with insulated ends and with grounded ends. The first experiment made by myself at New London on the U. S. S. E–1 employed an antenna extending forward from the conning tower, and a similar one extending aft. The ends were insulated, but later at Key West I made a test with the ends grounded to the hull, fore and aft. This latter test was, however, not successful, due to the comparatively insensitive receiver and detector.

"Since it was well known to both Rogers and myself that the ends of our antennæ might be connected to grounds, I did not consider grounding the ends of the wires was new at that time. The so-called single turn loop, as employed on submarine boats, is merely a specific form of the systems covered by the joint basic patents, and is not new, nor is it original with Lowell and Willoughby. These gentlemen are entitled to considerable credit for their work in connection with the development of this form, but I believe the pioneering was done by myself, and, had I been armed with an eight-tube amplifier, they would never have needed to take up the matter at all."

Spencer B. Prentiss, attorney for Rogers and Lyon in the matter of their joint application for a patent for underground and underwater antennæ, and one of the attorneys for Rogers in the interference proceedings here on appeal, testified that in the latter part of September, or on the 1st of October, 1920, he inquired of Lyon as to what disclosures, if any, Rogers had made to Lyon concerning insulated antennæ grounded on a submarine at each end. Lyon replied that Rogers had written to him two letters, suggesting that he try out the device referred to in the question, and that he thought that one of the letters contained a sketch, but that the other did not. As already stated, Rogers' letter of April 1, 1917, which should have contained the sketch on page 17 of his notebook, was not produced. Prentiss made a rough sketch of the deck and conning tower of a submarine, with stanchions at each end of the vessel, and Lyon completed the sketch by drawing lines sloping from the conning tower to the bow and stern of the vessel, which lines he said represented insulated wires, the ends of which were grounded on the ends of the deck of the vessel and represented the antennæ tested by him at Key West.

On December 5, 1919, Lyon, knowing that to constitute a joint invention, both parties must work together, and that there must be cross-disclosure and suggestions between them, wrote to Rogers, claiming an undivided one-third interest in the invention in issue, and that the patent should have been applied for as the joint invention of himself and Rogers. Notwithstanding that letter Lyon testified on behalf of Willoughby and Lowell that no disclosure or suggestion of the device was ever made by Rogers, and that the experiment at Key West was made without suggestion from any one at all, and was proposed by himself alone. What Lyon said or wrote to Rogers, Prentiss, or Wilson might well be rejected, as not the best evidence, if Lyon had not taken the stand for appellees and given testimony at variance with the oral and written declarations made by him to Rogers, Wilson, and Prentiss, thereby making such declarations competent evidence to be considered in determining the facts of the case.

Speaking of antennæ grounded fore and aft to the hull of a submarine, Lyon testified as a witness for Willoughby and Lowell that—

"I then grounded this end of the antennæ to its supporting stanchion, thus making the antennæ grounded at both ends. I then made a further attempt to use this grounded arrangement trying to transmit to the radio station, and I believe my signals were heard by that station. I then had the radio station send signals to me which I received, but which were not of considerable strength. I concluded I was on the wrong track. I repaired the broken ends removing the grounds and reinsulating them."

Rogers designated Lyon as the person to make tests of antennæ on submarines. The Navy, representing the government, the party in interest here, enrolled Lyon in the government service and bound him to make secret reports of his tests to the Navy. Rogers wrote to Lyon three times in March, 1918, for information as to the particulars of experiments made by him, and Lyon replied that he made weekly reports to Le Clair, and that as he was bound by a pledge

of secrecy he could say nothing without "permission from the powers that be."

James C. Rogers wrote in February, 1918, to Le Clair, the officer in charge of all radio work for the Navy, and the officer to whom Lyon made his reports, requesting information as to what had been done by Lyon. That information was not furnished. Under date of April 12, 1918, James Harris Rogers wrote to Lieut. Le Clair asking what had been done by Lyon at Key West, and received in reply the curt answer that Lyon had not had very great success with his experiments.

Demand was made in the interference proceeding for the production of the secret reports made by Lyon, and the Navy Department saw fit to eliminate from the produced documents reports made in April, May, June, July, August, September, October, November, and December, 1917, and reports made in January, February, March, April, May, June, July, and August, 1918.

In view of the attitude of the government, the party in interest, the mutilation of the secret reports of Lyon submitted to it, and of the further fact that Lieut. Le Clair after Lyon's test of antennæ grounded fore and aft to the hull of a submarine, told Willoughby on or about April 23, 1918, that "he was quite anxious for us to have a talk with Mr. Lyon before going to New London, as Mr. Lyon was familiar with submarines doing experimental work at Key West," we are fully justified in concluding that Le Clair was willing to give Willoughby and Lowell access to information which he denied to Rogers. Willoughby, it is true, was unable to recall that Lieut. Le Clair told him of the nature of the work done by Lyon at Key West. As Willoughby and Lowell, however, were at that time members of the naval organization and were under the direct command of Lieut. Le Clair, it is fair to assume that that officer did not leave his subordinates, Willoughby and Lowell, entirely uninformed as to what his subordinate, Lyon, was doing.

Hampered as he was by the lack of wholehearted cooperation on the part of Lyon and the lack of information as to experiments made by the latter, Rogers, after Lyon went to New London, determined to make experiments of his own as to the feasibility of submarine radio communication, and particularly as to the efficiency of his conception of March, 1917, which made the hull of the submarine a part of the loop. Not having a submarine at his disposal for uninterrupted and uncontrolled experimentation, he, about June 1, 1917, simulated a submarine by laying underground two lengths of pipe, each 100 feet long; the inner ends of the pipes being slightly separated, but connected by wire. He then ran an insulated wire from the south window of his laboratory, and grounded it to the south end of one pipe, and a similar wire from the north window of his laboratory, and grounded it to the north end of the other pipe. The inner ends of the insulated wire were connected in the laboratory to the receiving apparatus, and a variable condenser was also connected in the circuit. The iron pipes took the place of a submarine, and the insulated wires connected with the ends of the pipes were the antennæ.

Rogers drew a diagram of this arrangement and explained it to Dr. Lattimer in June, 1917, and Dr. Lattimer on the witness stand distinctly recalled the diagram and reproduced it. Dr. Lattimer fixes the date of the burial of the pipe as about June, 1917. Matthews also corroborates Rogers regarding the laying of the pipes and the attachment thereto of the insulated wires running from the laboratory. On December 18, 1918, Commander Hooper, of the Navy, wrote a letter removing the ban of military secrecy on Rogers, and on December 28th, 10 days after the receipt of that letter, Rogers took steps to file his application for the patent in issue, and that application was actually filed on January 10, 1919.

The evidence on the part of John A. Willoughby and Percival D. Lowell is to the effect that in 1918 Willoughby was 26 years of age and Lowell 25 years of age. Both of them were then in the government service at the Bureau of Standards, and neither of them, before engaging in the experiments hereinafter recited, was an expert in radio telegraphy, although both of them had given some study to the subject. During the latter part of February or the first of March, 1918, Willoughby and Lowell began experiments on single turn loops at the Bureau of Standards, to establish the possibility of transmitting and receiving radio messages in wave lengths suitable for submarine work.

On the 4th of March, 1918, as appears from Willoughby's time-card at the Bureau of Standards, Willoughby made a single turn loop, 150 feet long by 60 feet high, on which he was able to get a range of wave lengths from 100 to 1,500 meters. By means of that loop he was able to receive signals better than any theretofore received from any of his tests. He claims that it was at this time that he got the idea of using

the hull of a submarine as one part of the loop. As he had no submarine on which to make a test of that idea, he used a radiator in his house for one side of the loop in place of a submarine, and found that the loop worked satisfactorily. Willoughby claims that he told Elliott Woods, superintendent of the United States Capitol, about his experiments with single turn loops, and that he submitted rough sketches to Woods, and explained to the latter the application of different kinds of loops on submarines. Willoughby and Woods, however, are not in accord as to the particular type of installation he sketched for Woods. Neither Willoughby's sketches nor Wood's sketches of Willoughby's sketches, as understood by the former, disclose the invention in issue as settled by the counts of the interference.

For the purpose of securing an opportunity to make tests on a submarine, Willoughby on April 17, 1918, made a personal report to Dr. Rosa, of the Bureau of Standards, in which report Willoughby stated that "the first step would be to construct a loop using the hull of the submarine as one side of the loop (see diagram) and to determine whether it is possible in this way to receive or transmit or both under water."

On the strength of that report the matter of making tests on submarines was taken up with Lieutenant Commander Le Clair, of the Navy, and on his suggestion Willoughby and Lowell were loaned to the department. Both were sent to New London, and there made their first tests on the submarine D–1 on April 25, 1918. When Willoughby and Lowell reported to Lieut. Heard, commanding officer of the D–1, they told him that they desired to test insulated loop antennæ on a submerged submarine, and that for the test of the closed loop an extra lead-in would be required. As soon as the extra lead-in was installed, the test was made, and the signals came in strong as the lower part of the antennæ went under water, but when the antennæ was completely submerged the signals were markedly reduced in intensity. Several other tests with various other forms of loop antennæ were then made, for the purpose of giving them a thorough trial; but not a single test was made of an insulated radio conductor mounted along the length of the submarine, and having the ends of the conductor electrically connected with the hull of the vessel, thereby making the hull the lower part of the loop. Apparently the several tests of other forms of loop were not impressive, and tests of the completely insulated wire loop were resumed, with the result that signals were received at depths and distances greater than those noted on the first test.

On June 5, 1918, a serious leak having developed on the D–1, Willoughby and Lowell were transferred to the submarine G–3, where they repeated the installation of the complete wire loop disclosed by their Figure 4, admittedly not within the issue, and which was the first loop tested by them on the D–1. The G–3 arrived at Brooklyn on June 6, 1918, at which point Lowell left the submarine and returned to New London by train. Willoughby remained on board and went on patrol duty with the G–3, which had been ordered to operate against a German submarine, the prompt appearance of which was then expected off the coast of the United States. While the G–3 was on patrol duty the insulation on that part of the wire loop which was secured to the deck by brackets became defective, and Willoughby found that the wire was absolutely bare in many spots. Willoughby, according to his own statement, *became very much worried* upon discovering that the insulation had been broken, and he tried to have it repaired at sea. On June 11, 1918, and before any repairs could be made, however, the submarine dived, and Willoughby testified that he was *very much surprised* to find, not only that the signal strength remained after the lower side of the defectively insulated loop had been completely submerged, but *that the loop worked just as well as if it had been completely insulated.*

Willoughby, on June 11, 1918, declared in writing that the efficiency of his submerged loop, the deck part of which was defectively insulated, *led him to believe that the hull of the boat when submerged could be used for the lower side of the loop,* and that he accordingly informed the commanding officer of the submarine that the lower side of the loop could be cut out entirely and *a much simpler installation made.* That installation was made upon June 20, 1918, upon the return of the G–3 to port.

If Willoughby and Lowell conceived, prior to June 11, 1918, the doing away with the lower side of the loop and using the hull of the boat instead, it is impossible to understand just why Willoughby was worried because the insulation of that part of the loop bracketed to the deck was worn away and had become defective. If he and Lowell had already conceived that the hull of the vessel would serve as the lower part of the loop, there was no occasion at all for worry, and no necessity or excuse whatever

for the attempt he made at sea to restore the insulation; and why should he have been *surprised* that the efficiency of his loop was not affected by the grounding of his loop to the hull of the boat because of defective insulation, if he and Lowell had already conceived that such a grounding would serve the purposes of radio communication on submarines. Moreover, it is inconceivable that Willoughby and Lowell would have left untried the loop in issue, and installed on a submarine actually engaged in war duty a radio device which would interfere with the free use of the deck, if they had already conceived of an arrangement which was much simpler and left the deck unincumbered. Willoughby admits that the radio results obtained from the defectively insulated loop on the diving of the submarine G-3 led him to believe that the hull of the boat could be used for one side of the loop; but just how he could have been led to believe that which Lowell and himself had conceived months before is not explained. True enough, both Willoughby and Lowell testified that they had conceived the invention in issue long prior to their assignment to duty with the Navy, and that they were joint inventors thereof; but that testimony may be and ought to be rejected, if wholly inconsistent with their conduct prior to the initiation of the interference proceedings, and with declarations made by them, or either of them, at a time when there was no reason to believe or suspect that their priority in the field would be questioned.

[1] The evidence in the interference proceeding, and particularly the evidence hereinbefore recited, convinces us, as it did the Examiner of Interferences and the Board of Examiners, first, that Rogers conceived the invention in issue in March, 1917, and that there was no conception thereof, either by Willoughby or Lowell, until June, 1918; second, that Rogers disclosed his invention to Lyon, and that after that disclosure, and in March, 1918, Lyon at Key West made tests on the submarine K-3 of Rogers' conception; third, that the diving on June 11, 1918, of the G-3 with a defectively insulated loop led Willoughby to the discovery that the hull of the vessel could be used as the lower part of the loop, and that the bracketing of a part of the insulated loop to the deck was unnecessary; fourth, that the discovery which resulted from that dive was actually reduced to practice when the arrangement conceived on June 11th was actually installed on the G-3 on June 20, 1918.

We cannot, however, agree with the Pat-

ent Office tribunals that the test made by Lyon at Key West in April, 1918, was a mere abandoned experiment, and not a reduction to practice. Moreover, the finding of the Patent Office that Rogers was lacking in diligence and that Willoughby and Lowell were joint inventors is not sustained by the credible testimony and evidence in the case.

Lyon, a witness hostile to Rogers and favorable to Willoughby and Lowell, testified positively and unequivocally that he tested the invention in issue at Key West on a submarine, and that he believed the signals were received by the radio station, and that he received signals from the radio station, but that they were not of considerable strength. In his letter to Wilson, Lyon stated that he made the test with the ends of the loop grounded to the hull fore and aft, but that this test was not successful, *due to the comparatively insensitive receiver and detector*. In that letter he took occasion to say that *it was well known to both Rogers and himself that the ends of their antennæ* might be connected to the grounds, and that he did not consider that the grounding of the ends of the wire was new at that time. True enough, Lyon testified for Willoughby and Lowell that he concluded that he was on the wrong track, but it cannot be seriously contended that *his* conclusion as to the effect of his test was conclusive as to its success or binding on Rogers. He sent signals to the radio station and received signals from the radio station. That the signals were not strong was not due to the antennæ or the grounding of the ends thereof to the hull, but to an insensitive receiver and detector. Lyon so states in his letter to Wilson, and therein specifically declares that, had he been armed with an eight-tube amplifier, Willoughby and Lowell would never have needed to take up the matter at all.

The device might have been susceptible of further improvement, or it might have been equipped with a better amplifier, or a more sensitive receiver and detector; nevertheless, the test as actually made demonstrated that by it radio communication could be had, and that was enough to establish the test as a reduction to practice.

[2, 3] On the facts of this case we are unwilling to hold that Rogers was bound to make tests of his conception "under actual service conditions," or to hold that a test made on a simulated submarine could not under any circumstances or state of facts be accepted as a reduction to practice. We

are fully aware of the rule that to constitute a reduction to practice the test must be made under service conditions or on an instrumentality or utility in practical use. That rule, however, has no application where it is impossible for the inventor to make his tests under service conditions, or where because of government control and the pledges to the government of his representative enrolled in the Navy the inventor is denied information as to the experiments actually made. To hold otherwise would put the original inventor at a distinct disadvantage with government officials and employees, who entered the field later, and who could reduce their conception to practice under service conditions.

Inasmuch as any invention made by Willoughby and Lowell redounded to the benefit of the government under the Act of March 3, 1883, 22 Stat. 625 (Comp. St. § 9441), it was quite natural for Lieut. Le Clair to deny to Rogers access to information which he freely gave to his subordinates, but that attitude on his part and the imposition of secrecy on Lyon, Rogers' agent, did not bar the door on Rogers to a reduction to practice by a means which as nearly as possible simulated service conditions. But, however that may be, Rogers filed his application for a patent as diligently as the circumstances and the pledge of secrecy given by him permitted.

The contention that Rogers might have filed his application without breaking his contract of secrecy, and that therefore he was not diligent, cannot be sustained. Rogers agreed to keep secret and consider as strictly confidential all knowledge, information, and data concerning his invention, except such information as had already been disclosed by the issuance of his patents, and that he would not cause to be issued letters patent by any *municipality, state,* or *nation.* That agreement might well impress laymen and not a few lawyers with the firm conviction that the filing of an application for a patent constituted a breach of the contract.

The fact that Rogers filed his application within 10 days after the ban of secrecy was removed shows to a conclusion that he put the broadest construction on his agreement to keep his invention a secret, and even if he was mistaken as to the construction of his contract that construction satisfactorily explains his failure to file.

The claim of Willoughby and Lowell that they were joint inventors is discredited by the fact that on the D–1 they jointly tested practically every type of loop, except the loop grounded fore and aft to the hull of a submarine. Those tests were made for the purpose of making our submarines more efficient in our war with Germany, and the fact that the invention in issue was not tested at all is fairly strong evidence that any idea which Willoughby and Lowell had about it on the D–1 had not yet reached the stage of interesting surmise. That conclusion is strongly fortified, not only by the acts and conduct of Willoughby on board the G–3 while Lowell was in New London, but by Willoughby's oral and written declarations concerning the revelation which came to him *alone* when the submarine dived on June 11, 1918, with his defectively insulated loop. It may be that the joint application might have been amended in the Patent Office into a sole application by Willoughby. In re Roberts, 263 Fed. 646, 49 App. D. C. 250. As Willoughby, however, did not elect to take that course, we must pass upon the record as we find it. We must therefore hold that the Patent Office is without authority to award priority of invention to Willoughby and Lowell as joint inventors. Mills v. Darlington, 38 App. D. C. 95.

The carefully prepared opinion of the Examiner of Interferences and his painstaking, impartial summary of the evidence in the case, has been of decided assistance to the court, and is much appreciated, although we find ourselves unable to agree with all the conclusions which the Examiner reached.

Priority should have been awarded to Rogers, and consequently the decision of the Commissioner is reversed.