**Edwin H. LAND and Meroe M. Morse,
Appellants,**

v.

**Francis A. REGAN, Jr., Seamon A. Lincoln and Donald E. Hanson,
Appellees.**

**Patent Appeal No. 7288.**

United States Court of Customs
and Patent Appeals.
March 11, 1965.

Donald L. Brown, Cambridge, Mass., for appellants.

Herman Hersh, Chicago, Ill., James H. Littlepage, Washington, D. C., for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

Land and Morse, junior party [1] in Interference No. 90,976, appeal from the decision of the Board of Patent Interferences awarding priority of invention to Regan, Lincoln and Hanson, the senior party.[2]

1. Land and Morse are involved on the basis of their application Serial No. 523,792, filed July 22, 1955.

2. Regan, Lincoln and Hanson are involved on the basis of their application Serial No. 498,192, filed March 31, 1955.

The invention relates to a photomechanical reproduction process for producing a master copy of an original document for use in printing further copies, as defined in the single count:

"2. A process comprising the steps of applying to a photoexposed silver halide stratum and a superposed hydrophilic, water-receptive, silver-receptive stratum which contains nuclei for precipitation of silver from a water-soluble silver complex, an aqueous alkaline solution of a silver halide developer and a silver halide solvent, reducing the exposed silver halide in the silver halide stratum to silver, forming from unreduced silver halide in the silver halide stratum a water-soluble silver complex, diffusing the complex to the silver-receptive stratum, producing from the complex in conjunction with said nuclei a visible image on the silver-receptive stratum, said image having first areas that contain silver concentrated primarily at the surface of said silver-receptive stratum in thin but substantially continuous, oleophilic dense masses and second areas that are substantially silver-free, thereafter stripping the silver halide stratum from the silver-receptive stratum coating said silver-receptive stratum, with an ink which will preferentially wet said first areas, and pressing the image onto a copy sheet in order to transfer said ink thereto."

We find the following portion of Regan's brief which describes both the photomechanical reproduction process known as lithography and the process of the count to be helpful toward understanding the issues and subject matter involved in this appeal:

"In lithographic reproduction, use is made of a lithographic master or plate having a hydrophilic,[3] water

receptive, ink repellent surface that is imaged with an ink receptive, water repellent material. In the copy process, the imaged plate is first wet with an aqueous medium followed by application of a greasy ink composition. The aqueous medium only wets out the non-imaged portions of the master which are hydrophilic or water receptive. When the imaged master is subsequently treated with the greasy ink composition, the ink is repelled by the wet, non-imaged portions of the plate and received only by the unwetted ink receptive imaged portions of the plate.

"When the plate thereafter is brought into contact with an offset blanket (in offset printing) or copy sheets (in direct printing), ink composition transfers from the inked portions of the plate and not from the uninked, non-imaged portions of the plate thereby to produce inked reproductions or copy of the image that is formed on the plate. The wetting and inking operations can be repeated any number of times for multiple copy reproduction.

"The critical relationship for the production of copy by lithography is the maintenance of a high contrast between the ink receptivity and water repellency of the imaged portions as compared to the hydrophilic, water receptivity and ink repellency of the non-imaged portions of the plate whereby the aqueous medium goes only to the non-imaged portions while the ink goes only to the imaged portions of the plate.

"In the practice of the invention covered by the count in interference, a negative having a silver halide in a colloid coating is exposed to an original. The exposed negative is then brought into surface contact with a master, defined as a receiv-

3. Hackh's Chemical Dictionary (3rd Edition, 1944) defines "hydrophilic" as "describing a substance which absorbs or adsorbs water," and "hydrophile" as "A substance, usually in the colloidal state or an emulsion, which is wetted by water, that is: attracts water or water adheres to it."

ing sheet having a *hydrophilic, water receptive* stratum which contains nuclei for precipitation of silver. The exposed negative is wet with a developing solution containing a silver halide developer and a silver halide solvent which operates to convert the exposed silver halide in the negative to silver while the unreacted silver halide in the unexposed portions of the negative are dissolved and formed into a complex which then transfers by diffusion from the negative to the silver receptive stratum of the master wherein the nuclei functions to reduce the complex to a silver image on the master.

"The important discovery that is represented by the count is that, when the diffusion transfer process is carried out on a receiving sheet in which the silver receptive stratum has a *hydrophilic water receptive* surface, the silver image that is formed by diffusion transfer of silver halide from the unexposed portions of the negative is highly ink receptive and water repellent, while the unsilvered non-imaged portions of the plate remain hydrophilic and water receptive thereby to provide the necessary contrast between the water repellent, ink receptive silver image and the hydrophilic, water receptive, and ink repellent nonimaged or non-silvered portions of the plate. To achieve the desired contrast, it is desirable that the silver in the imaged portions be concentrated primarily at the surface' in thin but substantially continuous oleophilic dense masses while the non-imaged portions of the plate are substantially free of silver."

■ Regan took no testimony and is accordingly restricted to his filing date of March 31, 1955, for conception and constructive reduction to practice. Land

makes no claim of diligence from a date prior to Regan's filing date until his own filing date. The principle issue before us, therefore, is whether Land has proved by a preponderance of the evidence that he reduced the invention to practice prior to Regan's filing date. Land stipulated the direct testimony of his witnesses and introduced several exhibits to show actual reduction to practice in September-October 1954. Five of those witnesses were cross-examined on Regan's behalf:

Miss Meroe Morse—coapplicant and manager of black-and-white photographic research, Polaroid Corp.

Miss Elizabeth Yankowski [4]—laboratory technician.

Eugene Emerson—physicist.

Frederick Binda—laboratory assistant.

Frank Martin—asst. manager of black-and-white photographic research.

The board, in considering the testimony of those witnesses in its relation to each of the process steps and results which must be proved to establish Land's contention that the invention was reduced to practice in September and October 1954, regarded the last step of the count, viz. pressing the image onto a copy sheet in order to transfer ink thereto, "as important as all the remainder combined, for it is necessary for Land to prove * * * that the result was a useful one and satisfied the goals laid out by or for Land in performing the experiments." It devoted a large portion of its opinion to a summary of the testimony it considered on that aspect of the case, saying:

"* * * Miss Morse identified as Exhibit 3 * * * a notebook containing work performed by Mrs. Johnson, as Exhibit 4 a notebook containing a great deal of other work * * * and testified that

"'she was particularly pleased with the work of Mrs. Johnson

4. A sixth witness, Mrs. Ann Johnson, a laboratory technician assigned by Miss Morse to perform the experimental work relied upon here, also testified on direct.

The parties stipulated that the testimony on cross-examination given by Miss Yankowski would be that given by Mrs. Johnson were she available.

and considered her experiments completely indicative of the commercial applicability of the process in photomechanical reproduction.'

"Mrs. Johnson * * * did not confirm or corroborate her satisfaction or that of Miss Morse concerning the results * * *. She * * did not testify that reasonably good results were attained with any degree of consistency or that any knowledge of how to attain such results * * * accrued from her experiments. The failure to follow through with other work between the date of the experiments (September and October 1954) and the patent application (July 22, 1955) gives credence to Regan's theory that the opposite was the case. * * *

"Miss Elizabeth Yankowski was a laboratory technician of longer experience than Mrs. Johnson and was assigned by Miss Morse as an advisor to Mrs. Johnson in this work, which she closely observed. * * * she gave no positive testimony on direct examination that the results of Mrs. Johnson's work were those desired. She did, however, refer * * * to 'the good clear images of excellent contrast' and * * * 'the good ink reproductions affixed in the notebook.'

"On cross examination, Miss Morse referred to a problem called 'silvering', involving packing of the silver in too dense form * * *, and indicated that this phenomenon could prevent satisfactory performance of the process * * *. She did not say whether Mrs. Johnson ran into this problem or fairly solved it in relation to her work on this invention. In referring to the fact that Mrs. Johnson obtained only four copies in her work, Miss Morse testified * * *:

"'I think we were looking for a high quality, * * *.'

and that 'four seemed adequate to demonstrate the quality.' In refer-

ring to the ink in the background of Exhibit 3, * * * 'the most successful copies', she admitted that this problem existed and that it might have been caused by 'a trace of silver in the background', and stated that this was 'one of the things we were studying.' * * *

"In response to a question as to whether the copy of Exhibit 3 was 'really satisfactory copy as a commercial operation' she testified * * *:

"'This is a fine point because as far as the experiment and something *potentially commercially interesting*, I thought it was very exciting. It was exciting *as an experiment* and exciting from the *possibility of being potentially commercial*. If you ask me would I recommend to our sales department that they put on the market something that looked like that— I don't think you would ask such a question.' * * * [Board's emphasis]

* * * Miss Yankowski, in responding to a question as to why on some of the exhibits 'the non-imaged portions took ink and the imaged portions did not, ['] answered * * *:

"'I think it was done under very crude conditions.'

* * * * * *

"When we refer to the exhibits themselves and relate them to this testimony we conclude that Land's case, viewed in its most favorable light, does not prove that he demonstrated the usefulness of the process prior to Regan's filing date and priority will accordingly be awarded to Regan."

█ We have quoted almost the entire portion of the board's opinion directed to Land's efforts to establish usefulness of the claimed process in order to present a clear picture of the board's reasoning. We shall now set forth our reasons for concluding the board erred in

holding that Land failed to demonstrate the usefulness of the process which was practiced prior to Regan's filing date.

Miss Morse, Mrs. Johnson and Miss Yankowski each testified to the effect that the primary object of the experiments carried out in September and October 1954 and represented in Exhibits 3 and 4 was "to determine what specific materials would give the greatest deposit of silver on the surface of the silver-receptive stratum" to be used as the printing master. It was observed by each that the transfer of ink from a dense silver image deposit resulted in copy of the greatest contrast and clarity. Miss Morse testified:

"* * * We had observed that the kind of * * * silver halides influenced the denseness or the compactness with which we could form a silver deposit. I asked her [Mrs. Johnson] to try a variety of the commercially available negatives. * * I also asked her to take photomicrographs and see if we could characterize for ourselves the kind of negatives we would like * * *. We wanted to make the most desirable difference between the areas which would accept the ink and those which would not accept the ink. The more dense the silver deposit, the more effective it was. * * *

* * * * * *
* * * we made other modifications and changes in [developer solution] concentration, such as alkali, or changes in the hypo.[5] Those would be dictated really by the negative we were going to use. For instance, we used Industrial X–Ray negative be-

cause it was what I call silver rich * * *."

The broad experimental program discussed above was further outlined by Miss Morse in memoranda identified as Exhibits 4A and 4B, dated September 13 and September 27, 1954, which served as guides for Mrs. Johnson in her work. Land's Exhibits 3 and 4 show the results of that program to provide a photomechanical master having an image in terms of hydrophilic silver-free areas and ink-receptive silver areas which would be used in a printing process. In general, the exhibits represent about 35 separate experiments, employing different silver halide emulsions, developer compositions, silver-receptive strata, exposure times and development times. The results are in terms of series of copies, obtained by wetting the unsilvered areas of the master with an aqueous solution, rolling an inked rubber roller over the master to deposit ink on the silver image, and pressing a copy sheet against the master with a heavy steel roller. Approximately four copies were obtained from each inking of the master; further copies were attained by reinking the master.

Land relies most heavily on experiments performed September 16, 1954, yielding the copies constituting Exhibit 3,[6] as embodying a successful reduction to practice. We have examined those copies, and agree with the characterization of them by Miss Morse:

"XQ188. It shows * * * [ink] in the background, does it not, Miss Morse? A. It does show ink. *Nevertheless, it also clearly shows that the experiment was effective and operative.* We transferred from a silver image made by our technique

5. "Hypo" is sodium thiosulfate, a silver halide solvent.

6. Exhibit 3 includes a memorandum dated September 16, 1954, from Mrs. Johnson to a Polaroid patent attorney describing how *"the most successful copies were made."* (Emphasis added] The record establishes that the negative silver halide emulsion utilized was a commercially available du-Pont X-ray film known

as Fine Grain Industrial-Type 506. The aqueous developer solution was coded "0180;" Martin identified that solution as containing hydroquinone as developing agent, sodium hydroxide as alkali, and sodium thiosulfate as silver halide solvent. The silver receptive stratum was coded "RC–2350" and, according to Martin, contained silver sulfide as a silver precipitating agent.

—we transferred a legible *dense* ink image." [Emphasis supplied]

That testimony, coupled with her statements that she "was particularly pleased with the work of Mrs. Johnson" and that she thought the experiments were "very exciting" and "potentially commercial" convince us that Miss Morse was satisfied with the results of the work.

The other witnesses similarly indicated their satisfaction with the results of those tests. Martin, in response to a question whether the copy of Exhibit 3 "is an acceptable product as far as copies are concerned," answered "I would say so. * * * It is a good copy." Miss Yankowski testified:

"XQ58. When did you get to the point where you decided that it was no longer experimentation, that you had a workable process? A. *We thought it was workable after the first experiment. We were just improving the quality.*

"XQ59. The quality you produced on the very first test would be *commercially acceptable*? A. No; we thought the first few experiments were exciting and they worked." [Emphasis supplied]

When asked "would you consider this [Exhibit 3] acceptable copy for the trade?", she replied "No, but I think it is good copy. * * * As a matter of fact, we have copying machines that did not do it as well. * * * I don't mean Polaroid; I mean others." Adding those statements to her earlier references to the "good ink reproductions" obtained with the "dense deposits of silver," and considering all of the testimony as a whole, we believe that the dense ink images appearing in Exhibits 3 and 4 satisfied the goals of those conducting the research and were of a quality sufficient to indicate utility in the contemplated environment.

■ This court has said many times that a commercially acceptable embodiment of the invention is not necessary to proof of actual reduction to practice. Tansel v. Higonnet et al., 215 F.2d 457,

42 CCPA 732; Schnick v. Fenn, 277 F.2d 935, 47 CCPA 1174; Creamer v. Kirkwood and Torre, 305 F.2d 486, 50 CCPA 715. While the board recognized that performance of a commercially acceptable quality is not necessarily required, its emphasis on Miss Morse's answer to the question whether Exhibit 3 "was really satisfactory as a commercial operation" we think demonstrates, in final analysis, that it did not apply the standard of those cases in analyzing the testimony and exhibits before it. We do not consider the fact that the witnesses stated the process to be "potentially commercial" or "commercially promising" to be any justification for applying the test of whether the process results were *in fact* commercially acceptable in determining the success of the process. We daresay it is the ultimate goal of every inventor to develop a process which is successful in a competitive commercial market. Simply because the ultimate goal—a process of commercial quality—has not been achieved is no reason to conclude that the practicality of the process has not otherwise been demonstrated or that it does not perform the function for which it was designed.

Other evidence which convinces us that Land and Miss Morse were satisfied with the results obtained by Mrs. Johnson is the following statement in their patent application that

"* * * Commercially available, gelatino silver halide emulsions which have been found to produce goods results are sold by DuPont under the trade designations 'X–Ray Fine Grain Industrial 506 * * *.' "

That emulsion is the same as used in Exhibit 3 and many of the examples in Exhibit 4. We do not have here the situation of the embodiments relied on for reduction to practice being different from those specifically disclosed in the application, as was the case in Walkup v. Grieg, 52 CCPA 701, 332 F.2d 800, 141 USPQ 777.

The board concerned itself with the testimony of Miss Morse on cross examination that a problem called "silvering,"

involving packing of the silver in "too dense" form on the silver-receptive stratum, could prevent satisfactory performance of the process. We believe the board misinterpreted Miss Morse's testimony in that regard. As Land points out in his brief, the "problem" of "silvering" or "mirroring" was nonexistent so far as the process recited in the count is concerned. The record shows the testimony in question was instead directed to a problem which had undesirably affected the appearance of a positive print obtained in the use of the *commercial* Polaroid Land camera in 1954. The obtention of "silvering" is desired in the process of the interference count, as is clearly evident from the words "thin but substantially continuous, * * * dense masses," appearing therein, and also from Mrs. Johnson's testimony with reference to masters obtained by the process of the count that "the great *density* of the silver image is readily observable by the amount of *reflection of light or 'mirroring,'* as opposed to the usual black as seen by the eye when viewing an ordinary photograph." [Emphasis added] We again note Miss Morse's testimony, earlier quoted, that "The more *dense* the silver deposit, the more effective it was." [Emphasis added]

The board referred to the fact that Mrs. Johnson obtained *only* four copies in some of her work. We must assume the board regarded that fact as further indication that the results achieved by Land were not successful. If, indeed, the board would require a showing that *many* copies could be obtained from the process, it went far beyond the terms of the count and Land's specification to glean Land's intended purpose. The count requires but one transfer of ink, and Land's specification, in describing the preferred embodiment of his invention, says "In this way, four good copies * * * were produced without reinking." Cf. Conner v. Joris, 241 F.2d 944, 44 CCPA 772.

In referring to the ink in the background of Exhibit 3, which Mrs. Johnson termed "the most successful copies," both the board and Regan apparently regarded Miss Morse's testimony that "There may be a trace of silver in the background here which was retaining a trace of ink" and that "This is one of the things we were studying" as further evidence that the process had not been successfully reduced to practice.

■ We do not agree. A successful reduction to practice does not require perfection or incapability of improvement. Furthermore, the interference count calls for "second areas [background] that are *substantially* silver-free," and coating "with an ink which will *preferentially* wet said first areas [which contain silver in dense masses]." [Emphasis added] That the process of the count was not intended to exclude a trace of silver in the background is evident from the decision of the Primary Examiner who granted motions by both Land and Regan to dissolve the interference as to an earlier count reading "second areas that are silver-free." The examiner said:

> "*Both* parties are in accord that the present count embodies certain language which is inappropriate to a proper description of the invention. The language of the instant count pertaining to the second areas produced in the silver receptive layer as being silver-free is objectionable since apparently *some small amount of silver halide may transfer over from exposed areas of the silver halide stratum.* Moreover, since both parties disclose the use of colloidal silver as silver precipitating nuclei, *manifestly, the second areas are not entirely silver-free.* * * *
>
> * * * * * *
>
> "* * * there is a more acceptable term * * * [in the expression] 'substantially'." [Emphasis added]

We believe the results achieved are clearly within the purview of the count.

One further point deserves comment before leaving this aspect of the case. In his brief, Regan places great emphasis on nine of Land's 35 experiments identi-

fied as Exhibits 4D1–4D9, all of which show *negative* copies obtained when the ink adhered to the *nonimaged* portions of the master rather than to the silvered portions. Relying on Sherwood v. Drewson, 29 App.D.C. 161; E. I. duPont de Nemours & Co. v. American Cyanamid Co., 120 F.Supp. 697; and Harding v. Steingiser et al., 318 F.2d 748, 51 CCPA 701, Regan's position is that Land's experiments as a whole only indicated promise or future fulfillment and that they had not attained a certainty demonstrating the capacity of the invention to produce the desired result.

We think Regan and the board have placed undue emphasis on that minority of exhibits showing poor results and have neglected to accord proper weight to the good results shown in the exhibits. As we noted earlier, Land's experiments were directed to testing the process using a wide variety of materials under different conditions. The mere fact that Exhibits 4D1–4D9 illustrate that tests using some materials under some conditions were not successful does not mitigate the fact that the successful tests do establish with a reasonable certainty or probability that the process will operate in the intended manner.

Regan's argument might have merit if reproducible results with a given combination of negative, processing composition and silver-receptive stratum had not been achieved by Land. See Conner v. Joris, supra. But distributed throughout Land's Exhibit 4 are copies obtained using the same materials employed in producing the copies of Exhibit 3. We find those copies to be equal in quality to Exhibit 3, and note that they were obtained on various dates throughout September and October of 1954. Copies obtained by employing other commercial negatives, e. g. Kodak Fine Grain Positive and duPont Fine Grain Pan, are equally as good. The record does not support the board's finding that reasonably good results were not obtained with any degree of consistency, or that Mrs. Johnson was unable to learn how to repeat her better results.

In short, we regard the pattern of results as a whole to be positive in nature, not negative and erratic, and believe Land has proved by a preponderance of the evidence that the tested process operated satisfactorily.

For the purpose of that portion of its opinion evaluating the results as set forth above, the board assumed that the individual steps performed by Mrs. Johnson conformed to the details recited in the remaining steps of the count. Upon consideration of the testimony on the latter point, it found such conformity had not been proved. In reaching that conclusion, the board granted Regan's motions to strike the testimony of Miss Morse, Mrs. Johnson, Mr. Martin, and Miss Yankowski, directed to establishing certain details of the process, "to the extent that we have refused to consider the testimony of these witnesses on these points."

The record shows that 22 times during cross-examination of the above witnesses, Regan's counsel moved to strike their testimony. Those motions were occasioned by instructions to the witnesses from Land's counsel to refuse to answer certain questions on the grounds that (1) the questions were directed to subject matter not relevant and not material to the invention as defined in the count, and (2) answers to the questions would reveal trade secrets and confidential information.

We consider the following colloquy which took place during cross-examination of the witnesses to be exemplary of the proceedings:

"XQ 32, 33. In your testimony as to the preparation of Exhibits 3 and 4 * * * what compositions are those? A. [Miss Yankowski] They contain the necessary ingredients, the alkali, the silver halide solvent and the developing agent.

"XQ34. Is that all that was present in those compositions? A. I don't remember. There were probably others *but those were the necessary ones.*

"XQ35. *What are the other ingredients present in those compositions?* [Emphasis added]

"Mr. Isaacs: I am going to object to this question as immaterial, beyond the scope of the direct, and as involving secret and confidential information as to the specific other ingredients, and I therefore instruct the witness not to answer.

"XQ36. Will you answer the question, Miss Yankowski? A. No.

"Mr. Hersh: In the light of the witness' refusal to answer the question, and in the light of her disclosure of only part of the compositions which were employed by her as a basis of her testimony and in the production of Exhibits 3 and 4, and through the experimentation on the subject matter of the application in interference and the count in interference, the senior party is unable to either prove or disprove the testimony of this witness and therefore, is incapable of conducting proper cross examination, and is also incapable of taking rebuttal testimony to prove or disprove the statements of this witness. In the light of our inability to cross examine fully and completely, I move to strike the testimony of this witness, and particularly her testimony with respect to the essential description of the compositions employed by her or by Mrs. Johnson or by Miss Morse in the experimentation. This is withholding critical and essential evidence.

\*　\*　\*　\*　\*　\*

"XQ123. In paragraph 22 of your stipulated testimony you state that the developing compositions were formulated to contain hydroquinone, sodium hydroxide, and sodium thiosulfate; do you know this of your own knowledge? A. [Miss Yankowski] Yes.

"XQ124. *What else did they contain?* [Emphasis added]

"Mr. Isaacs: \* \* \* [Objection]

\*　\*　\*　\*　\*　\*

"Mr. Hersh: \* \* \* [Motion to strike]"

Similar objections and motions to strike were made when Martin, after explaining that the silver-receptive stratum RC–2350 contained silver sulfide as silver precipitating nuclei, was questioned as to "what other materials were present" in addition to the silver sulfide.

The board stated:

"\* \* \* the refusal to answer questions directly related to the process details, which might have enabled Regan to disprove Land's contentions by rebuttal or further cross-examination or might have enabled Regan and this Board to judge whether the conclusions of Land's witnesses were in fact well founded, leaves us no alternative except to ignore the testimony \* \* \* on these points (See Kelly v. Park et al., 1897 C.D. 182; Miller v. Kelley, 1901 C.D. 405; Rinehart v. Gibson, 1912 C.D. 587 [sic: 387]; Rogers v. Willoughby and Lowell [1 F.2d 824] 55 App.D.C. 65, 1924 C.D. 342; and 98 Corpus Juris Secundum [Witnesses], paragraph 381 page 141) \* \* \*. \* \* \* refusal to answer questions as to composition pertinent to the direct examination effectively vitiates the examination process. \* \* \* the testimony withheld was necessary to fill out critical information, and might well have confirmed or refuted Land's contentions in support of the counts. \* \* \*"

The testimony sought by Regan was, in the board's judgment, "both relevant and material."

We have examined all of the testimony, as the board must necessarily have done in reaching its conclusion. In relating that testimony to the count, we observe initially that the process steps set forth in the count are recited in broad terms.

The negative utilized is a "silver halide stratum;" the developer solution is recited as "an aqueous alkaline solution of a silver halide developer and a silver halide solvent;" and the "silver-receptive stratum" is defined in terms of its "hydrophilic, water-receptive, silver-receptive" properties and as containing "nuclei for precipitation of silver." It is only those materials and properties which the count requires in the operation of the process.

It is apparent from the foregoing that the witnesses did not withhold information directly material and relevant to the issues defined by the count. The witnesses had already testified specifically as to all the actual ingredients and properties called for by the count when Regan, on cross-examination, collaterally asked, for example, "What else did * * * [the composition] contain?", and the witnesses refused to answer. We think those refusals insufficient grounds to warrant striking the testimony of the witnesses, recalling that a motion to strike, if granted, renders the evidence *inadmissible*. The four cases cited by the board in support of granting the motions to strike are hardly authority for the action taken. Rather, those cases appear to stand for the proposition that refusal of a witness to answer *pertinent* questions affects the *weight* to be accorded the testimony of the witness.[7] Our further consideration of Land's testimony directed to establishing reduction to practice of the remaining steps of the count will be on the basis that all of the testimony is admissible in evidence because of its obvious material and relevant nature. The refusal of the witnesses to answer Regan's questions will be accorded appropriate significance in our determination of its probative value, credibility and weight.[8]

To establish a reduction to practice of the process steps of the count, Land has the burden of establishing by sufficient credible testimony that the limitations as to materials, properties, steps, and results required by the count were present in the work performed by Mrs. Johnson and Miss Yankowski in September and October of 1954. Unlike the board, we are satisfied that Land has proven by a preponderance of the evidence the hydrophilic character of the silver-receptive stratum, the presence of nuclei for precipitation of silver, the recited constituents of the developer composition, the specific mechanism of silver diffusion and precipitation, the concentration of the silver at the surface of the master, the substantial freedom from silver of the non-imaged areas, and the preferential wetting of the imaged (silvered) areas by the ink.

In his brief, Regan again draws attention to Exhibits 4D1–4D9 as "indicative of the fact that the non-silvered non-imaged portions [of the master] were less hydrophilic and water receptive than the silvered imaged portions," and as showing that the ink did not preferentially wet the silvered areas. While we agree with Regan's arguments as to those nine exhibits, we think the converse of the argument is equally true, and that the remaining 25–30 test results in Exhibits 3 and 4 show the non-silvered areas were hydrophilic and the ink preferentially wetted the silver image. Mrs. Johnson's memorandum in Exhibit 3, describing the technique used to make the copies therein, states that the master was "swabbed" with "Platex" [a commercially available aqueous solution used to wet non-imaged, hydrophilic areas of lithographic plates] before being inked. In paragraph 3 of the memorandum, she observed that "the ink adhered only to

7. See also Bordenkircher v. Solis Entrialgo y Cia., S.A., 100 USPQ 268 (Com.Pat. 1953) for a review of Patent Office practice in this regard.

8. The view we take of this case renders it unnecessary to consider whether the questions propounded by Regan on cross-examination were directed to material and relevant subject matter. It should also be readily apparent that this court is not capable, on this record, to determine the validity of Land's second ground for refusal to answer Regan's allegedly material questions, that of privilege arising from trade secrets.

the black lettering and not to the  *  *  * background."

We have considered Regan's additional assertions in his brief and at oral argument that complete information as to the materials present in the developer solution and silver receptive stratum was necessary because

"It is well known by those skilled in the art that any *resinous material, oil or other oleophilic ingredients in the developing solution or in the silver receptive stratum* will function as an imaging material to interfere with the balance between the ink receptive, water repellent image portion and the hydrophilic, water receptive, ink repellent non-imaged portion of the silver receptive stratum so that the plate would no longer be *suitable* for a copy process" [Emphasis added]

We do not find those speculations to weaken the positive force of either the testimony or the exhibits. The exhibits as a whole illustrate better than words the improbability of the presence of foreign materials which affect the process.

As for the recited constituents of the developer solution, we noted earlier that Martin's stipulated testimony states that he knew "of his own personal knowledge that the 0180 processing solution [utilized in Exhibit 3 and also many times in Exhibit 4] was an aqueous alkaline solution which contained hydroquinone [developing agent], sodium thiosulfate [silver halide solvent] and sodium hydroxide." That testimony stands uncontradicted, and was subject to no motion to strike.

It would unduly lengthen this opinion to analyze in detail all the testimony of the witnesses relating to the remaining features of the count. We have considered Regan's further contentions that Land has not proven the non-imaged areas to be substantially free of silver. Our study of the entire record in light of Regan's arguments convinces us that the process

practiced by Land and his associates in September and October of 1954 conformed to the limitations of the count.

The decision is reversed.

Reversed.