## WILLOUGHBY et al. v. ROGERS.

District Court, D. Maryland. July 11, 1927.

No. 656.

**1. Patents ☜94—Act authorizing issuance of patents to government officers without fee, conditioned that the inventions may be used by the government or others in the United States without charge, held constitutional (Comp. St. § 9441).**

Act March 3, 1883 (Comp. St. § 9441), authorizing issuance of patents to government officers without fee, conditioned that the invention may be used by the government or any other person in the United States without payment of royalty, held constitutional.

**2. Patents ☜114—Government officers, applying for patent, may maintain suit in equity in aid of their application (Comp. St. § 9440).**

Government officers, applicants for a patent under Act March 3, 1883 (Comp. St. § 9441), though having no monetary interest in the patent, if granted, are real parties in interest, within equity rule 37, and may maintain a suit in equity, under Rev. St. § 4915 (Comp. St. § 9440), in aid of their application.

**3. Patents ☜91(1)—One applying for patent, after invention was conceived and reduced to practice by another, must show that his conception was first and reasonable diligence in its reduction to practice.**

As between two applicants for patents for the same invention, a finding that one conceived the invention and reduced it to practice before application was filed by the other places on the latter the burden to show that his conception was first, and that he was reasonably diligent in reducing it to practice.

**4. Patents ☜328—Willoughby and Lowell held entitled to patent for submarine radio apparatus, for which patent No. 1,303,729 was granted to Rogers.**

Priority of invention for a submarine radio apparatus, for which patent No. 1,303,729 was granted to Rogers, awarded on the evidence to Willoughby and Lowell, and the Rogers patent further held invalid for failure to reduce the invention to practice with reasonable diligence.

In Equity. Suit by John A. Willoughby and Percival D. Lowell against James Harris Rogers. Decree for complainants.

See, also, 1 F.(2d) 824.

Edward G. Curtis and Manvel Whittemore (of Emery, Booth, Janney & Varney), both of New York City, A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., and Harry E. Knight, of New York City, for plaintiffs.

James S. Easby-Smith (of Easby-Smith, Pine & Hill), and J. Hanson Boyden (of Prentiss, Stone & Boyden), both of Washington, D. C., for defendant.

SOPER, District Judge. John A. Willoughby and Percival D. Lowell have filed a bill of complaint under R. S. § 4915 (U. S. Compiled Statutes, § 9460), praying to be adjudged entitled to receive a patent for a certain invention of new and useful improvements in submarine radio apparatus. It appears that on January 10, 1919, an application for patent for the invention was filed in the United States Patent Office by the defendant, James Harris Rogers, to whom patent No. 1,303,729 was issued May 13, 1919. The second claim of the patent, which is sufficiently illustrative, is as follows:

"2. The combination, with a submarine vessel having a metallic hull, of an insulated radio conductor extending longitudinally thereof and connected electrically at its ends with said hull, whereby a loop oscillating circuit is provided, and electromagnetic signaling instruments associated with said looped oscillating circuit."

The specification of the patent declares that it relates to radio signaling, and has for its object the provision of an improved system for use in connection with vessels, particularly submarines. The invention comprises the employment of a radio conductor or antenna, running fore and aft, and so mounted as to be in electrical connection at its outer ends with the metallic body of the vessel, but otherwise insulated therefrom and

from the water, when the submarine is submerged. Sending and receiving instruments are arranged to be associated with the conductor at a point intermediate its ends.

On October 31, 1919, Willoughby and Lowell filed an application in the United States Patent Office for the same invention under the Act of March 3, 1883 (22 Stat. 625 [Comp. St. § 9441]), which authorizes the Commissioner of Patents to grant an officer of the government a patent for an invention, when it is used or to be used in the public service, without the payment of any fee: Provided that the applicant in his application shall state that the invention may be used by the government, or any of its officers or employees in the prosecution of work for the government, or by any other person in the United States without the payment of any royalty thereon. Accompanying the application were certain drawings or figures of the device installed in various forms, which it is well to describe at this point, because they not only indicate the identity of the invention with that of Rogers, but will also serve to clarify the discussion which takes place below. It will be sufficient to explain Figures 5, 2, and 4, which are substantially as follows:

Figure 5 shows a conductor or antenna extending from a support at the bow of the vessel to an insulator amidship; thence downwardly through a lead-in to the signaling apparatus within the hull. Similarly the opposite end of the conductor extends from the stern to the insulator amidship and thence downwardly to the instruments. At the bow and at the stern the antenna is electrically connected to the boat, thus constituting the entire hull as part of the loop circuit.

Figure 2 shows an antenna grounded to the hull of the boat at the stern; thence extending over the support at the stern and the radio mast amidship to the support at the bow; thence running back to a lead-in amidship, through which it is brought to the signaling instrument inside; and thence to the hull of the boat on the interior, where it is grounded. It will be observed that whereas, in Figure 5, the antenna is grounded at each extremity of the boat on the outside, in Figure 2 one end is grounded outside at the stern of the boat, while the other is grounded inside, substantially in the center of the boat, after passing through the instruments.

Figure 4 shows an arrangement of the loop antenna, consisting of a continuous bottom conductor running fore and aft the entire length of the vessel; thence at each end of the vessel the conductor extends upwardly over supports to masts amidship; and thence

down within the vessel, where it is connected with the instruments. It is not grounded or electrically connected at any point to the hull of the vessel, and is not within the interference now to be described.

On December 30, 1919, an interference between the Willoughby and Lowell application and the Rogers patent was declared. The subject-matter involved in the interference was stated in four counts, copied from the claims of the Rogers patent; count 2 being a copy of claim 2 above set out. A great mass of testimony was taken by the parties to the interference when the case was heard by the usual tribunals in the Patent Office. They united in awarding priority to Willoughby and Lowell, although the grounds upon which the decisions were rested differed in some respects. Upon appeal to the Court of Appeals of the District of Columbia, the decision of the Patent Office was reversed, and priority was awarded Rogers. The pending case ensued.

[1] Certain defenses, not affecting the merits of the controversy, may be first disposed of. In the first place, it is urged that the Act of March 3, 1883, is unconstitutional. Section 8, article 1, of the Constitution gives Congress the power to promote the progress of science and useful arts by securing to inventors exclusive rights to their discoveries. This grant, it is said, does not cover an enactment which, while authorizing the grant of patents to officers of the United States, requires the applicants to give up their exclusive rights and dedicate their discoveries to the public. The decision of the District Court of the Southern District of New York in George Owen Squier v. American T. & T. Co. (decided September 3, 1924), 21 F.(2d) ——, affirmed on appeal in (C. C. A.) 7 F.(2d) 831, is cited. Neither of the opinions in this case discussed the question of constitutionality; but it was held that the right to use a patent issued under the act is dedicated thereby, not only to the United States, but to all other persons in the United States, whether they be in the service of the government or not.

Assuming that such is the effect of the law, it nevertheless seems to be within the scope of the granted power. The apparent inconsistency involved in the grant of a patent, which on its face confers exclusive rights, and at the same time dedicates them to the public, has its place in the scheme of the patent statutes. The grant of the patent gives rise to the presumption that the patentee is the first inventor, and places upon all other persons claiming priority the burden of proof. There is no impropriety on the part

of Congress in granting exclusive rights, free of charge, to one who simultaneously agrees to dedicate them to the public.

[2] In the next place, it is urged that the plaintiffs have no such title or interest in the litigation as to justify the prosecution of the action in their names under equity rule 37. It is clear that Willoughby and Lowell can reap no monetary reward under the patent applied for. It may further be said that the United States is the real owner of the invention, since, as will hereafter appear, it was discovered by persons in its employ who were assigned to work out the problem. Nevertheless the act of 1883 provides another method by which patent rights to inventions made by government employees may be acquired. The United States has chosen not to assert its rights of ownership, growing out of the relationship of employer and employee, but desires the actual inventors to take out the patent in their own names. If Willoughby and Lowell had chosen to apply for a patent under the general patent statutes, rather than the act of 1883, such a question might have arisen; but they, as well as the government, have selected the method provided by the special statute. If it is proved that the invention was made by them, the grant of the patent will credit them with an important contribution during the course of the World War. It cannot be said that they have no real interest in the litigation.

In the third place, it is said that the suit must be dismissed because the application made by them to the Patent Office did not specifically declare, as required by the act of 1883, that they were officers of the government at the time of the filing thereof. This is, of course, a highly technical defense, since it is conceded that, at the time of the discovery and of the application, they occupied an official relation to the Bureau of Standards. Moreover, by their application they prayed for the grant of letters patent without payment of fee, pursuant to the Act of March 3, 1883, and appointed an Assistant to the Attorney General as their attorney to prosecute the business for them. Accompanying the application was a letter from the attorney, stating that they were employees of the Bureau of Standards, whereupon the Patent Office replied that, in order to comply with the law, it was necessary that the applicants state in their application that the invention might be used by the government and the public generally, and that an amendment to that effect should be made. The amendment was accordingly filed. Under these circumstances,

it is clear that there is no merit in the contention.

The Court of Appeals found—see Rogers v. Willoughby, 55 App. D. C. 65, 1 F.(2d) 824—(1) that neither Willoughby nor Lowell had any conception of the invention until June, 1918; (2) that on June 11, 1918, Willoughby accidentally discovered the invention when on board the United States submarine G–3; (3) that the invention was not made jointly by Willoughby and Lowell, but by Willoughby alone; (4) that the discovery was reduced to practice on the G–3 on June 20, 1918. The Court of Appeals also found (1) that Rogers conceived the invention in March, 1917; (2) that Rogers disclosed the invention to Harry H. Lyon, and that subsequently, in March, 1918, Lyon tested the invention on board United States submarine K–3 at Key West; (3) that the test made by Lyon at Key West in April (?) 1918, was a reduction to practice of the Rogers disclosure; (4) that a test made by Rogers in 1917 on land on a simulated submarine, hereinafter described, was, under the circumstances of the case, equivalent to a test under actual service conditions, and was a reduction to practice; (5) that, under the circumstances of the case, Rogers filed his application for the patent with due diligence.

In 1917, Rogers was 67 years of age. He had devoted considerable time for years to the study of electrical phenomena, and was particularly interested in the sending and receiving of wireless messages through the instrumentality of underground and underwater antenna. Interest in his experiments and researches was stimulated by the submarine problem, which arose during the World War. He engaged Harry H. Lyon, a young man 19 years of age, to assist him in making the necessary tests. As a consequence of their investigations, two joint patent applications were filed on November 10, 1916, one of which resulted in a joint patent, No. 1,220,005, issued March 20, 1917. The other was pending in the Patent Office during the events of this case, and resulted finally in joint patent No. 1,322,622, on November 25, 1919.

The patents relate to the transmission of messages by the employment of wires buried beneath the surface of the earth, but insulated therefrom, and substantially parallel with the earth's surface. The system was said to be adapted to the use of vessels at sea, including submarines, and it was claimed that reception of messages is highly efficient when the antennæ are lying on the bottom, either in fresh or salt water, or when supported by

floats along the surface of the water. The purpose in part was to dispense with the erection and maintenance of elevated conductors.

Rogers' work was of great interest to officers of the United States Navy intrusted with the development of communication by radio, and he was in frequent communication and on friendly terms with many of them. The interest of the Navy took practical form. A contract between the Secretary of the Navy on one side, and Rogers and Lyon on the other, under date of October 24, 1917, recited the above-mentioned patent applications and the desire of the Department to use these means of radio communication, and it was agreed that, in consideration of $15,000, the United States Navy Department should have the right to use the underground antenna system covered by letters patent No. 1,220,005. It was further provided that, if by January 1, 1918, the inventors could devise means for the substitution of their underground antenna system for the aerial antenna system, the Navy Department would pay them an additional sum of $45,000, and if by the use of their underwater antenna system they could by March 1, 1918, make a satisfactory exchange of radio communication between submarine vessels submerged in salt water up to a distance of 25 miles, the Department would pay the inventors for the right to use the invention the sum of $15,000. A supplemental agreement, prepared in October, 1917, further provided that the inventors should keep secret all information concerning the inventions covered by letters patent and applications for letters patent, and would not cause to be issued any letters patent on said inventions, or any part thereof. There is no proof that this supplemental agreement was executed, although the terms of it were under consideration. Rogers testified that he considered himself bound by its terms. He also said that the provisions of the main contract were embodied in substantially the same terms in an earlier contract of February, 1917.

The importance of the problem during 1917–1918, in the midst of America's participation in the World War, is apparent from the fact that, prior to the invention in issue, it was not possible to communicate with submarines when submerged. The apparatus then in use consisted of antennæ of a four-wire type, supported at the bow and stern of the submarine on a three-foot mast, and amidships upon a collapsible radio mast; insulators being provided at these three points. The wires were brought into the vessel through a lead-in in the conning tower amid-

ships. Under favorable conditions, when the apparatus was perfectly dry, transmission and reception over a certain distance was practicable, but when the wire became wet from the spray in rough weather, or through submergence of the vessel, communication was practically impossible.

Other departments of the government were also active in endeavoring to find a solution of the difficulty, notably the Bureau of Standards of the Department of Commerce. Willoughby and Lowell were young men employed therein as laboratory assistants, occupied under the supervision of superior officers in radio research, but without particular scientific training. The evidence shows that in the early summer of 1917, when experiments were being made by the Director of the Bureau, with the assistance of Willoughby, in receiving radio signals over a small coil on a riverside, the coil accidentally fell into the water. For a few seconds the signals continued. This suggested to Willoughby that a loop of coiled wire might be useful in the receipt of signals under water. Shortly thereafter he and Lowell undertook a number of experiments with various forms of loops. They experimented at first with multiple turn loops. Early in March, 1918, they erected and successfully tested on land a large single turn loop about 150 feet long and 60 feet wide, receiving signals from distant stations. It then occurred to them, according to their testimony, that such a loop might be used on a submarine, the hull of the submarine forming the underside of the loop. Willoughby also experimented with the heating apparatus in his home, forming a loop of which the upper side consisted of two ends of wire joined to receiving apparatus, and the underside consisting of the radiator heating system. The purpose was to ascertain if the inclusion of a large bulk of bare metal in the loop would interfere with the reception of signals; the heating apparatus roughly representing the hull of the boat. Finding that signals were successfully received, the two young men were encouraged to believe that their system would work on a submerged submarine.

The testimony of both of them, as well as the testimony of their superiors in the Bureau of Standards, is that they were constantly employed jointly in the experiments indicated, and that they frequently drew rough sketches of loops or circuits, of which the hull of a submarine constituted a part. They were eager to test their ideas upon a naval vessel. Their superior officers were not sufficiently impressed with their ideas to recommend such

action. Finally Willoughby, of his own motion, some time between April 1 and April 10, 1918, called upon and gained the interest of Lieutenant Commander H. P. Le Clair of the Navy, who at that time had supervision of all experimental work upon radio apparatus for the department. It was suggested that Willoughby and Lowell be transferred to the Navy Department for work on actual submarines. Thereupon they were directed to write out in more formal shape a description of their ideas for the benefit of the Bureau of Standards and of the Navy. This report was prepared under date of April 15, 1918, and was submitted by the Director of the Bureau of Standards to the Navy Department by formal letter of April 20, 1918. It refers to the joint experiments of Willoughby and Lowell with closed loops submerged in fresh water, and to the interview with Le Clair. It requests that they be permitted to proceed to the harbor at which the submarines were located to conduct a series of experiments. Among other things it says: "The first step will be to construct a loop, using the hull of the submarine as one side of the loop (see diagram on attached sheet), and to determine whether it is possible in this way to receive or transmit, or both, under sea water." The attached diagram is a rough drawing of a submarine, showing a wire grounded at one end to the hull of the boat, thence extending over a mast amidships to a stanchion at the other end, thence entering the boat through a water-tight lead-in insulator to receiving apparatus, and thence grounded to the hull of the boat.

About this time, a cablegram was received from Admiral Sims, stating that the Germans were in possession of successful radio signal devices which could be operated on submerged submarines, and requesting that the Navy Department give immediate consideration to the problem. It was accordingly arranged that Willoughby and Lowell be transferred to the Navy, and proceed to the submarine base at New London. They arrived on April 24, and on April 26, made their first test and reduction to practice on the submarine D–1. The installation was somewhat different in detail from that shown in the drawing attached to their paper of April 15. They then supposed that it was possible to bring the wire inside the hull through a lead-in at one end of the vessel, but they ascertained upon their arrival at New London that the only means of entering the hull of a submarine is amidships. Accordingly, they grounded one end of the antenna at the bow or stern of the vessel, carried it forward over the mast amidship to the

other end, brought it back along the deck to the conning tower, thence inside and through the receiving instrument to the hull, where it was grounded. The effect was that about one-half of the hull, instead of the entire hull, formed part of the loop. Nevertheless the installation was substantially equivalent to that indicated in their original sketch, since it involved the important feature of grounding the ends of the antenna to the hull and including the hull as a part of the loop. It was also substantially similar to Figure 2 of their application for patent above described. It was essentially different from Figure 4, in which the wire is not grounded at all. The result of the test was that, when the boat submerged and the antennæ also were completely below the surface of the water, signals were successfully received. The Willoughby and Lowell idea was proved to be practicable, much to the satisfaction of the officers of the Navy.

This story, beginning with the experiment in the summer of 1917 on the river bank, and ending with the successful test on the D–1 on April 26, 1918, is established by the testimony beyond a reasonable doubt. Superior officers of Willoughby and Lowell in the Bureau of Standards, officers of the Navy at Washington and at New London, on shore and afloat, records of the Bureau of Standards and of the Navy, the log of the submarine, and a well-kept notebook of Willoughby and Lowell combine to prove the invention. One cannot, therefore, readily accept certain conclusions of the Court of Appeals set out on pages 830 and 831 (55 App. D. C. 71) of the report. The findings of fact are there made that on April 25, 1918, on the D–1, "not a single test was made of an insulated radio conductor mounted along the length of the submarine, and having the ends of the conductor electrically connected with the hull of the vessel, thereby making the hull the lower part of the loop"; that on June 5 Willoughby and Lowell, on the submarine G–3, "repeated the installation of the complete wire loop disclosed by their Figure 4,  *  *  * which was the first loop tested by them on the D–1." The antennæ in Figure 4, it will be remembered, are not grounded at any point. Again, on page 831, it is said: "There was no conception [of the invention], either by Willoughby or Lowell, until June, 1918." On the contrary, the evidence seems to compel the conclusion that the idea was conceived before April 15, 1918, and that it was reduced to practice successfully in the form of Figure 2 (not Figure 4) upon a submarine on April 26, 1918.

Between the date of this test and June 20,

1926, Willoughby and Lowell were continuously engaged in numerous experiments to determine the precise form in which the apparatus could be most successfully employed. In the interval, it was discovered that it is highly important to prevent the infiltration of sea water between the insulation of a loop wire and the wire itself, particularly at the point at which it enters the hull of the submarine. For some reason that has not been satisfactorily explained, the apparatus ceases to function if the bare wire is exposed to the water. To provide for this contingency, special water-tight grounding sleeves were made for use in connecting the wire electrically to the hull of the boat.

The final experiment which resulted in the standard and most efficient installation illustrated by Figure 5 must be described at some length. Owing to an accident to the D-1, the inventors were transferred to the G-3. Their intention in making the first installation on this boat was to use the hull as the lower side of the loop; but, owing to an emergency, there was not time to provide the water-tight sleeves essential to the efficient grounding of the antennæ at the ends of the boat. Consequently they confined their efforts to making an effective entrance for the wire amidships. An installation like Figure 4 was the result. It was a completely insulated loop, and the hull of the boat did not form a part of it. The vessel sailed from New London to New York. There was no time at the latter place to make the desired installation, as it was momentarily expected that she would be ordered to sea. At this time Lowell left the boat and returned to New London. When the vessel put to sea and submerged, the insulation upon the wires along or near to the deck was accidentally destroyed at places. Nevertheless the apparatus continued to operate, much to the surprise of Willoughby, because in his prior experience, when the insulation broke down, trouble was caused by the penetration of sea water underneath the insulation. This event led him to remove the lower wire along the deck, and to ground the ends of the upper wire at the bow and stern of the boat, using the hull as part of the loop. Thereby in effect the apparatus was changed from Figure 4 to Figure 5. This proved, after further experiment, to be the most effective device, especially when the wire at bow and stern was protected by water-tight sleeves. The final and successful test was made on June 20, and the arrangement became the standard installation in the Navy, and has since been used.

The events leading up to the installation on the G-3 and its subsequent success are thoroughly corroborated by a number of witnesses and documents, as in the case of the experiments prior thereto. Much emphasis is placed in the opinion of the Court of Appeals, however, upon a copy of certain notes on submarine work under date of August 1, 1919, which bear the typewritten initials of Willoughby, indicating that they were dictated by him more than a year after the work on the G-3. They contain the following paragraph: "June 11, 1918. While at sea the insulation of lower side of new type loop constructed on June 5, 1918, was found to be defective and the bare wire was exposed to the salt water. Upon submerging, however, I found, much to my surprise, that the loop worked equally as well as when it was absolutely insulated from the water. This led me to believe that the hull of the boat could be used for one side of the loop. I therefore cut out the lower side of the loop, and grounded the ends to the extreme ends of boat, giving us the final loop."

On pages 830 and 831 (55 App. D. C. 71) of the opinion of the Court of Appeals this statement is taken as conclusive proof that the idea of using the hull as part of the loop was first conceived on June 11, 1918, and then by Willoughby alone. Taken by itself, the language suggests the finding; but, when the preceding experiments and reports are taken into consideration, it does not seem to be justified. Indeed, the document under consideration itself refers to the experiment of April 25, 1918, and shows that therein was used "a closed loop with the hull as a return connection for one end." Moreover, in the same group of papers, which includes the document, is also found a copy of the memorandum of Willoughby of April 15, 1918, wherein the idea of using the hull of the submarine as one side of the loop is clearly disclosed. Bearing in mind the difficulties the inventors had had with the penetration of salt water between the wire and its insulation, the passage from the Willoughby memorandum of August 1, 1919, most probably refers to the unexpected operation of the apparatus, notwithstanding the exposure of wire, rather than to a discovery that the hull could be used as part of the loop.

The fixing of June 11, rather than April 15, or earlier, as the time of conception, would have little significance, were it not for the deduction of the court that the discovery was made by Willoughby alone on the G-3, without the co-operation of Lowell. The court held that the Patent Office was without authority to award priority of invention to Wil-

loughby and Lowell as joint inventors. This conclusion was doubtless influenced by the earlier assumption that prior installations made jointly by Willoughby and Lowell were confined to Figure 4, in which the antenna was not grounded. But when it is realized that the idea of using the hull as part of the loop was involved in the prior joint work of the two men, as shown by the first formal sketch of April 15, and also by the installation of Figure 2 on the D–1, it is clear that the joint application was warranted.

Rogers contends that Figure 2 is not within the spirit of the invention in issue. An examination of the language of claim 2 of the patent shows that it reads accurately, not only upon Figure 5, but also upon Figure 2, and upon the drawing of April 15, 1918. Each of these installations is described by the language of claim 2, which provides for "an insulated radio conductor extending longitudinally of the vessel and connected electrically at its ends with the hull." Rogers says that the expression "extended longitudinally" can only mean an arrangement in which the antenna extends along the vessel in the direction of the length and terminates substantially at the bow and stern, and cannot include an antenna looped back upon itself, as in Figure 2. Moreover, he says that the radio conductor in the patent is electrically connected at both ends with the hull, but in Figure 2 one end of the antenna is connected to the hull, while the other is connected to the signaling instruments.

This argument is technical in the extreme. It gives little weight to the fact that the essential element of the invention is found in Figure 2 quite as clearly as in Figure 5. The antenna in Figure 2 extends longitudinally of the vessel, since it begins at the stern and proceeds thence over the support and masts to the bow. The fact that it returns thence to the point of entrance amidships is immaterial. Furthermore the antenna is connected at both ends with the hull of the boat. It is true that the end of the antenna, which enters the interior of the vessel, first passes through the electro-magnetic instruments, but it is then grounded or electrically connected to the hull. Even if it should be held that, upon a strict technical reading of the claim, Figure 2 is not within the issue, it does not follow that Figure 5 was not a joint invention. Willoughby and Lowell worked in close co-operation from the summer or fall of 1917, and are jointly entitled to the conception of the idea of using the hull as a part of the loop. They also worked together in making the installation upon the G–3. It is true that

certain events upon the vessel took place on June 11 in the presence of Willoughby alone; but, since the fundamental conception was common to both, it cannot be justly held that Willoughby alone is entitled to the sole credit for the particular application of the idea upon which he then accidentally fell. Furthermore, between June 11 and June 20, the two men collaborated to produce the details of the standard form, which was finally adopted.

Before leaving the case of Willoughby and Lowell, it is necessary to examine the contention of the defendant that their discovery was not original, and that they derived their knowledge through Harry H. Lyon, the defendant's associate, and through certain officials and employees of the government. This matter is referred to on page 829 (55 App. D. C. 70) of the opinion of the Court of Appeals, where it is strongly intimated, if not determined, that information of Lyon's work was improperly withheld from Rogers, but freely given to Willoughby and Lowell. From March 2 to April, 1918, Lyon was experimenting upon radio communication with submarines as an employee of the Navy at Key West. He had been sent to test certain of Rogers' ideas. He made reports to his superior officers, and particularly to Lieutenant Commander Le Clair. He testified that on or about March 22, 1918, he made an experiment on the surface with a submarine with an installation quite similar to Figure 5, but, as the results were unsuccessful, he abandoned it. There is no testimony that a report of this experiment was ever made to Le Clair, or any other officer or employee of the government, or in fact to anybody else, until long after the Willoughby and Lowell invention; but it is inferred from the meager contents of certain replies of Le Clair to requests from Rogers as to the progress of the work at Key West, and from other circumstances, that some valuable information was obtained by Willoughby and Lowell through the medium of Le Clair and Lyon. In the month of April, Lyon was recalled from Key West, and had an interview with Willoughby and Lowell in Washington before they went to New London. When they arrived at New London, they worked in close co-operation with Ensign Stevers who was Lyon's associate at Key West.

Rogers requested, during the interference proceeding, the reports made by Lyon to his superior officers, and, when the documents were produced, certain parts during the period from April, 1917, to August, 1917, were eliminated. Willoughby and Lowell testified that they received no information of any sort

from Le Clair or Lyon bearing upon the invention. Le Clair was unavailable as a witness in the interference proceedings, and did not testify. For these and perhaps other reasons, the Court of Appeals found that the testimony of Willoughby and Lowell was unreliable on this point. The importance of the finding is not perfectly clear, since the court ultimately found that Willoughby conceived the invention in June, 1918; but it seems altogether likely that the court was especially influenced by the mutilation of the reports, and believed that the government had acted unfairly towards Rogers.

Certain additional evidence has been placed before the court in the case at bar which leads to a contrary conclusion. Lieutenant Commander Le Clair was present in court and testified that his first idea of the invention in suit came from Willoughby and Lowell, and was not at any time imparted to him by Rogers or Lyon. Besides, it is now clear, from certain letters of Lyon, produced for the first time, that the interview between Willoughby and Le Clair, which took place in the first part of April, and the report of Willoughby and Lowell of April 15, occurred while Lyon was still in Florida, and before his conference with Willoughby and Lowell in Washington. Furthermore, it is now conceded that there was no mutilation of Lyon's reports to Le Clair. The parts of the documents eliminated from the papers furnished in the interference proceedings have been produced. It is acknowledged that they have no bearing whatever on the matter in issue; so that the inference that the reports were mutilated in order to conceal from Rogers a discovery of his associate is without foundation.

The case on this point is therefore quite different from that which was before the Court of Appeals. It is not possible, on the evidence before the court, to conclude that officials of the United States conspired to defraud Rogers of his due, or that they were so disloyal to their country in April, 1918, as to deprive it deliberately of the services of a man of long scientific experience and commit the study of an important war problem to two relatively inexperienced young men. The reasonable conclusion is that at this juncture Rogers and Lyon had little of merit to offer, whilst Willoughby and Lowell had hit upon the solution of the difficulty.

[3] Since it is definitely established that Willoughby and Lowell conceived the invention and reduced it to practice months before the Rogers application for patent was filed, the burden of proof rests upon him to show that his conception antedated theirs, and that he was reasonably diligent in reducing it to practice. Christie v. Seybold (C. C. A.) 55 F. 69; Automatic Weighing Machine Co. v. Pneumatic Scale Corporation (C. C. A.) 166 F. 288. His application for patent was filed on January 10, 1919. The Willoughby and Lowell invention was substantially perfected on June 20, 1918. During the intervening months it was installed upon dozens of submarines, as was well known in naval circles, in which Rogers' acquaintance was large and intimate. Rogers' patent drawings as filed show substantially a diagrammatic replica of the final form of the Willoughby and Lowell loop, as developed by them after extensive experimentation. It is fitting that Rogers should prove the priority of his conception.

Moreover it should be noticed that, even before October 31, 1919, when Willoughby and Lowell made application for a patent, Rogers had information of their claims. He was first informed by one of the officers of the Navy. Subsequently, in August or September, 1919, one Oscar Nauck, an employee of the Bureau of Standards, surreptitiously removed from the bureau a file of papers referring, amongst other things, to the underwater radio experiments of Willoughby and Lowell, and also Willoughby and Lowell's diary, and brought them to Rogers at his laboratory at Hyattsville. It is not suggested that Rogers was a party to this impropriety. The evidence does not show that he advised or countenanced it. He testified that, as soon as he opened the diary and ascertained its nature, he refused to examine it further. But the title page shows that it is a memorandum book of P. D. Lowell and J. A. Willoughby on tests made with loops on submarines at New London from April 25 to October 1, 1918. The papers and the diary were not returned to the Bureau of Standards, but were delivered to an Assistant Secretary of Commerce through a business representative of Rogers. An attempt was made, with the aid of the Assistant Secretary, to prevent the bringing of Willoughby and Lowell's application into interference with the Rogers patent. The effort failed, and the interference was declared. The papers were retained by the Assistant Secretary until 1921, and on more than one occasion Rogers' representative had access to them. There can be no doubt, therefore, that Rogers had an opportunity to know the date of conception claimed by Willoughby and Lowell before he made his own declaration.

[4] The date of conception by Rogers is fixed by him as on or about March 1, 1917. A period of a year and ten months elapsed before the patent application was filed. Consequent-

ly it is not to be expected that he should have a definite memory of the exact date, except as it may be shown by record or other circumstances. His preliminary statement in interference, as first filed, declared that he conceived the invention on or about May 1, 1917. Subsequently it was corrected, and the date was fixed on or about March 1, 1917. He explains the change by stating that he found that the date of a memorandum, supposed to form the earliest record of the conception, which was first written March 31, 1917, had been erroneously changed to May 31, 1917. The memorandum in question and a sketch are contained in a small loose-leaf notebook, known as Exhibit D, which contains numerous rough memoranda in pen or pencil relating to a variety of disconnected subjects. It was obviously not intended to be a careful or permanent record. The proof generally shows that Rogers was neither careful nor methodical in recording his ideas or in conducting his correspondence. His letters to his assistant, Lyon, concerning the researches in which they were jointly interested, hereinafter referred to, were carelessly written on odds and ends of papers, and on their face bear little evidence that the writer regarded them as of sufficient value or importance to be preserved.

The page in the small notebook containing the sketch has three disconnected entries, of which only the second bears on the invention in issue. The first entry bears date March 31, and the word "March" has been obviously changed to May. This notebook, prior to the proceedings in the case at bar, has been exclusively in the possession of Rogers or his representatives. Nevertheless it is now urged that the change was deliberately and fraudulently made by one or both of two officials of the Bureau of Standards, who had an opportunity to examine it in the presence of others during a hearing in the office of the Assistant Secretary of Commerce. There is no evidence to support so serious a charge. Even if the officials in question were capable of fraud, they could have had no motive to change March 31, 1917, to May 31, 1917, since either date was long prior to the conception of Willoughby and Lowell. It is far more likely that the change was made by some one interested in the chronological arrangement of the book, who noticed that the last entry on the preceding page was dated May 1, 1917. It is immaterial whether the true date of the entry be March or May, and the change has very little importance, except to indicate the uncertain character of the record.

The sketch consists of a crude drawing of a boat equipped with an aerial attached to the bow and stern at either end, and leading down into the vessel amidships to a coil representing the signaling instruments. Written beneath are the words "Insulated Aerial Attached to Bow and Stern." At the junction of the ends of the aerial and the hull of the boat are two decided dots. The entire sketch and memorandum are in lead pencil. If the draftsman intended to indicate that the ends of the aerial were grounded to the boat, the sketch suggests the invention in suit. It is admitted that a dot in drawings of such apparatus usually indicates an electrical connection. On the other hand, there is no other suggestion or sketch of such a device in the 30-odd pages of the book. If the intention was to indicate that the ends of the aerial were grounded, the word "grounded," rather than the word "attached," in the appended note, would ordinarily have been used. Moreover, there is at least one other drawing in the book of a boat or submarine equipped with a radio apparatus, in which dots are used where Rogers manifestly did not intend to indicate an electrical connection. The notebook was not disclosed to any other person until after the interference was declared.

Rogers also relies upon a second and larger notebook in which the entries are more carefully made. It is known as Exhibit F, and covers a period from July 22, 1917, to August 2, 1919. It begins with a caption indicating that the succeeding diagrams illustrate tests with conductors laid in pipes. Fourteen figures in all are transcribed on pages 1 and 2, of which Figures 12 and 13, are particularly relied upon. Each of them consists of the outline of a boat looked at from above. Wires running from one end of the boat to the other, apparently inclosed in pipes and connected in the middle with a coil, indicating signaling apparatus, are depicted. Alongside Figure 12, written in a different ink, is a memorandum indicating that the drawing represents heavy insulated antenna grounded preferably at front and rear of boat, thus forming a kind of loop. Notwithstanding the similarity of the terms, it is not clear that Rogers' interpretation of the drawings as indicating the invention is correct. If he desired to show an elevated aerial passing over supports from the bow to the stern of the vessel, he would probably have shown a side elevation of the vessel, as he did in the sketch in the small notebook already discussed.

Since the drawing was arranged to show a bird's-eye view, it probably indicates that the aerial was inclosed within the hull of the boat and grounded at either end. That Rog-

ers was considering such an idea at or about this time is shown by other sketches, in the small notebook and elsewhere. Such construction is quite different from the invention in suit, and is inoperable so far as the evidence shows. Furthermore the inclosure of the aerial in a pipe differentiates the device from that under discussion. Finally it may be noted as to both notebooks that no witness is produced to whom they were explained as indicating the invention. Pages 1, 2, and 3 of the larger book bear the signature of Rogers' brother under date of July 22, 1917; but he does not remember definitely what was on the pages when he signed them, or what explanation of the sketches was then given him.

It is also contended that the conception of the invention by Rogers as early as June or July, 1917, is shown by the installation upon the grounds of his home adjoining his laboratory at Hyattsville of a device called by him a simulated submarine. He buried beneath the surface of the ground two sections of iron pipe, each 100 feet in length. They were placed end to end in the same general direction, the inner ends being separated 3 feet apart. The outer end of one section was situated on one side of the laboratory, and the outer end of the other section on the other side. Buried within the pipes were insulated wires. From the outer end of each pipe a wire was run to the laboratory. From the inner end of each a wire was also run to the laboratory. Rogers testified that it was his idea that the two sections of the pipe, considered as a unit, should represent the hull of a submarine, the laboratory representing the conning tower, and the wires running from the outer ends of the pipes to either side of the laboratory representing an antenna running from bow to the stern of the imaginary vessel. He testified that the inner ends of the pipes were joined together by a wire, which connection could be made or broken at will. When the connection was made, the continuous hull of a submarine was represented.

Thus he claims he constructed an apparatus which embodied the idea of the invention in suit. It should be noted at this point that, if the wires running to either side of the laboratory were connected with the insulated wires buried inside the pipes, the installation covered by the patent was not imitated. It was only when the wires from the laboratory were connected with the ends of the pipes themselves, and when also the inner ends of the pipes were joined together, that the patented device was represented.

Rogers produced as a witness one Mat-thews, who personally buried the pipes beneath the earth. In a general way he corroborated the construction indicated by Rogers, and says that Rogers called the apparatus a submarine; but he denies that the inner ends of the pipes were in any way connected. Quite a number of experiments were performed with his assistance. Sometimes the wires running from the laboratory to the outer ends of the pipe were connected to the pipes, and sometimes to the wires within the pipes; but at no time were the inner ends of the two sections of pipe joined electrically together to form a unit. The effect of this testimony is that, when the laboratory wires were grounded to the outer ends of the pipes, there was merely the installation of the antennæ grounded to pipes buried in the earth, and there was not the representation of a loop of which a continuous mass of metal similar to the hull of a submarine formed a part.

Further corroboration of the device is given by Dr. Latimer, Rogers' personal friend, physician, and neighbor. He saw something of the construction of the apparatus, but does not base his testimony upon his personal inspection. He testified on January 28, 1921, as to a rough sketch of the apparatus which Rogers had shown him 3½ years before. He reproduced the sketch from memory for the first time in December, 1920, when questioned by Rogers' attorney. The sketch drawn by Latimer on January 28, 1921, shows a continuous pipe, with wires running from either end to either side of the laboratory. Rogers explained to the witness that the pipes represented the hull, the laboratory the conning tower, and the wires the antennæ on board a submarine. The sketch which Rogers showed to Latimer in 1917 was not preserved, nor was the reproduction of the sketch made by Dr. Latimer for counsel in 1920 produced. Nor was there any drawing of the apparatus preserved by Rogers in either of his notebooks or in any other place. The greater part of the structure was destroyed by Dr. Rogers about the time that the interference was declared.

Under all these circumstances, it is not clear that great weight should be given to Latimer's testimony. It is conceded that he was honestly trying to state the facts, but it must be remembered that he was totally ignorant of the technical subject of radio communication. He would not be likely to appreciate the difference between the connection of the laboratory wires to the ends of the pipes themselves and the connection of these wires to the wires concealed within the pipes. The testimony of an unskilled witness as to the

nature of a mechanical sketch, 3½ years after it was exhibited to him, can hardly be considered as certain proof of its contents. In any event, the installation of the simulated submarine cannot be regarded as a reduction of the invention to practice, no matter what difficulty Rogers may have had in securing the use of a real submarine for the purpose. It is conceded by Rogers that, in the state of the art at that time, neither he nor any one else had any means of knowing whether any of his ideas would operate until they were tried under actual service conditions.

It is a matter of great significance that Rogers was unable to produce a single officer of the Navy to whom he had disclosed the invention prior to the Willoughby and Lowell discovery. He was on friendly terms with divers officers, who visited his home and laboratory and participated in his tests. He testified on several occasions that he disclosed all his inventive ideas to officers of the Navy after he signed the contract with the government in February, 1917. Some of them came to his laboratory in June, 1917, and conferred with him about his tests. He mentions a number of officials of the Navy and of the Bureau of Standards to whom he made explanations and demonstrations. If he was in possession of the conception in 1917, or in the first few months of 1918, it is difficult to understand why he did not impart it to one of these interested experts in radio phenomena. Latimer, the only person who testified that he received the disclosure, is a person without scientific training.

Rogers also testified that he disclosed the invention to his associate, Harry H. Lyon. In 1916 Rogers and Lyon were engaged in numerous experiments at Hyattsville in underground and underwater radio. The underground work consisted largely of burying wires in ditches inclosed in pipes. The underwater experiments were devoted to linear antennæ (as distinguished from loops), supported on floats on the surface or below the surface of the water, or allowed to sink to the bottom. The contract between the Navy Department and Rogers and Lyon was subsequently made. It was thought desirable in 1917 that Lyon be sent to New Orleans as an employee in the Navy to make further tests of Rogers' ideas. He there experimented with land installation only in connection with underground radio. He returned to Hyattsville in the summer. He was sent to the submarine base at New London in August, 1917, and there performed two kinds of tests. First, he experimented with lengthy linear wires sunk in the basin of the Thames river;

second, he made certain tests on the submarine E–1 with an insulated Kiebitz antenna. This device is not unlike the Willoughby and Lowell Figure 5, except that the outer ends of the wires, instead of being grounded to the ends of the vessel, are carefully insulated therefrom. The second class of experiments, therefore, approached much more nearly to the invention than the first, but was nevertheless distinct therefrom, since the antennæ were not grounded.

Lyon testified that he made tests with this installation on a submarine submerged, and received signals at appreciable distances from the transmitting ship. Nevertheless neither class of test was regarded as successful or complete, and, since weather conditions were unsatisfactory, Lyon was sent from New London to Key West to continue the experiments. He arrived on March 2, 1918, and continued with submarine radio tests until the middle of April. Much of the time was spent in testing the trailing antenna from 400 to 600 feet in length attached to the stern of a submarine and extending thence below the surface of the water. Experiments with the Kiebitz antenna were also continued, but without success, and hence in a final report thereon to the Navy on April 11, 1918, Lyon recommended, in view of the discouraging results obtained, that further tests be abandoned.

Rogers claims that he disclosed the invention to Lyon at Hyattsville as early as the summer of 1917, after Lyon's return from New Orleans. Lyon was not produced as a witness to support this claim during the interference proceeding, but certain statements by him were introduced as hearsay testimony by an attorney and by a business representative of Rogers. The representative said that in 1920 Lyon stated, in an interview in the lawyer's office, that the invention was communicated to him by Rogers in 1917, before Lyon went to New Orleans. Since the device was not discovered, according to Rogers, until after Lyon went to New Orleans, it may be that the witness intended to say New London, instead of New Orleans. The lawyer testified that in 1919, at a conference in his office, Lyon said that early in the spring of 1918 he received two letters from Rogers, suggesting that he test the device in issue, and that one of the letters contained a sketch of it. After the testimony of these two witnesses had been given on Rogers' behalf, Lyon was called as a witness by Willoughby and Lowell in the interference proceeding, and denied that Rogers ever disclosed the invention to him.

It is explained that Rogers failed to call Lyon as a witness because of strained rela-

tions between them. It is said that Lyon was aggrieved because Rogers required him, during the summer of 1917, to make payment of a debt which was due, and that Lyon was also offended because Rogers, in 1919, filed the patent in suit as his sole invention. There is no doubt that Lyon was offended because he was excluded from a share in the patent; but it does not appear that the incident of the debt in the summer of 1917 prevented the exchange of cordial letters between them. On the contrary, the correspondence in the years 1917–18 indicates that the two associates were on friendly terms. It was during these years that Rogers claims to have communicated his ideas to Lyon, and it was then that Lyon had an opportunity, not merely as a Navy man, but as Rogers' personal selection, to test them upon submarines under actual service conditions.

Lyon was not available as a witness during the trial of the case at bar. The testimony given by him in the interference proceeding was offered by the defendant Rogers and was read into the record. The defendant also offered the depositions of the attorney and representative of Rogers, who testified in the interference proceedings that Lyon admitted to them the communication to him of the idea by Rogers. Objection was made to the receipt of this testimony, on the ground that Rogers was thereby placed in the position of contradicting his own witness. The objection was probably well taken, since Lyon, in the case at bar, was not produced as a witness by the plaintiff. But finally the objection to the testimony was withdrawn by the plaintiff, so that the whole might be considered by the court.

While Lyon was absent at New Orleans, New London, and Key West, he not only reported to Lieutenant Commander Le Clair, but was also in constant correspondence with Rogers. Many letters passed between them, of which 91 were offered in evidence. One would naturally suppose that the correspondence would throw some light on Rogers' claim of disclosure. Before the letters were produced, Rogers testified that most of them referred either directly or indirectly to the invention in issue; but no letter produced in evidence mentions it. It was claimed during the interference proceeding that an expression in letter 57 from Rogers to Lyon, under date of March 11, 1918, indicates the device, since it refers to the grounding of the antenna. The available letters have now been arranged in chronological order, so far as can possibly be done, in view of the absence of dates from some of them, and it seems to be quite clear that the expression in letter 57 relates to a trailing antenna, and not to an aerial installed upon the deck of the submarine.

The claim is made that Lyon suppressed all of the Rogers letters which would demonstrate that Rogers was in possession of the invention before Willoughby and Lowell. The Court of Appeals, on pages 827, 828 (55 App. D. C. 69), makes note of the fact that there is no letter from Rogers of April 1, 1917, and suggests that there should have been such a letter, and that it should have contained the sketch on page 17 of the small notebook, because Rogers said he was in the habit of writing daily letters and communicating his ideas to Lyon. The absence of a letter of that date hardly seems to support the argument. Rogers himself was unwilling to testify that he communicated the idea to Lyon by letter to New Orleans. Furthermore there is no certainty as to the precise date of the entry in the small notebook. Rogers claims that the entry was made not earlier than March 31, and not later than April 4. Five letters from Rogers to Lyon were produced for the interval beginning March 31 and ending April 5. Not much reliance can be placed upon the absence of a letter of any particular date. Moreover, there was nothing in any event to prevent the production by Rogers of Lyon's letters. It is quite certain from the correspondence that Rogers did not preserve all of them. It is hardly fair to suggest the suppression of evidence by Lyon, because of the failure on his part to preserve all of the letters from Rogers, particularly when the very disorderly character of such as were preserved and produced is taken into consideration. As a matter of fact, the letters between the parties do show that a number of different forms of installation were discussed. They were at this time on good terms. If the invention in issue had been conceived by Rogers at this early date, some mention of it would most probably have appeared in some of the numerous letters from Rogers produced by Lyon, or in some of the smaller number of letters of Lyon produced by Rogers.

Great weight is given by the defendant to statements in letters of March 11 and March 18, 1918, written by Lyon at Key West, indicating that, because of the obligation of secrecy imposed by the Navy, he was not able to give Rogers the details of the work, and suggesting that Rogers might ask Lieutenant Commander Le Clair. It is contended that these letters explain the absence from Lyon's communications of any reference to the invention. However, even at this period there is mention in the Lyon letters of the general character of his work and reports

of certain experiments. The acknowledgment by Lyon of the receipt of a request from Rogers to try out the invention in issue would have been no breach of secrecy on Lyon's part.

Emphasis is placed by the Court of Appeals upon a letter of December 5, 1919, written by Lyon to Rogers, as evidence of Rogers' disclosure of the invention. The letter calls Rogers' attention to a contract between them of December 5, 1916, by which it was agreed that Lyon should have an undivided one-third interest in each of the inventions or patents that might be issued. Lyon contends in the letter that the patent in suit should have been applied for as a joint invention, and that in making an individual application Rogers has violated the provisions of the contract. The assignment of a one-third interest in the patent is demanded. This letter is quite consistent with the theory that Rogers had previously communicated the invention to Lyon; but it may also be taken to show merely that, in Lyon's opinion, he was entitled under the contract of 1916 to a one-third interest in all patents relating to the subject-matter granted to Rogers.

Consideration should be given to an experiment, already mentioned, which was made by Lyon at Key West on or about March 22, 1918. The defendant claims that this test, which took place before the Willoughby and Lowell installation of April 25, was an actual reduction to practice of the Rogers' invention. Lyon was engaged in testing a Kiebitz antenna on the submarine K–3. A heavily insulated wire ran forward from the conning tower, and a similar wire ran aft, each of which was secured to a stanchion at the bow and stern respectively. The ends were covered with rubber caps, as insulation. The inner ends were carried down inside the boat and connected with the sending instrument. During a transmitting test, the insulation at the ends broke down, whereupon Lyon grounded them to the hull and was able to receive signals from a station on shore. But they were not of any considerable strength. The recital of this experiment is given only in the testimony of Lyon. He says that, in view of his lack of success with the apparatus, he concluded that he was on the wrong track. He therefore repaired the broken-down ends by removing the grounds and reinsulating the wires. When the experiment took place, the submarine was on the surface, and Lyon concluded that, since the signals were so weak, there was no use in attempting to get signals when submerged.

Since the test was a failure, he regarded

20 F.(2d)—63

it as unimportant, and made no report of it to any other person either in or out of the Navy. No person other than the crew of the submarine were present, and they did not know what was going on. On November 18, 1920, 2½ years after the experiment took place, Lyon stated in a letter to a representative of Rogers that this test was not successful because of the comparatively insensitive receiver and detector. In view of the great similarity of this accidental installation with the Willoughby and Lowell Figure 5, the failure may have been due to inadequate apparatus. Nevertheless, Lyon did not reach this conclusion when the failure occurred, but only after the device had been proven by others. There can be no question that this transaction amounts at the most to an abandoned experiment. It is thus described by the only person who had any understanding of it.

For another reason the experiment was not a reduction to practice. The submarine was moored to the dock upon the surface of the water, and no effort was made to ascertain if the installation would operate with the submarine submerged. Subsequent experiments by Willoughby and Lowell indicate that such an apparatus, in which the grounded ends are exposed to the salt water, ordinarily will not operate when wet. No person could then have been certain, without trial, that messages would have been received by the submarine under the surface of the water. The defendant argues, with more regard for the letter than the spirit of the invention, that the claims of the patent do not cover the submergence of the submarine. The claims, however, of which claim 2 is an example, do refer to submarines, and the specification shows that the inventor was not ignorant that a submarine is intended to go below the surface of the water, and that underwater communication was the problem which he claimed to have solved.

The value to the defendant of Lyon's part in the case depends in large measure upon the contention that, when the interference was declared, Lyon had become Rogers' enemy, eager to do him harm. Indeed, the defendant assumes, when Lyon gives injurious testimony, that the opposite is the fact, although there may be no other evidence to establish it. Negative corroboration of this sort is entitled to little weight. But the great weakness of the defendant's position is Lyon's lack of motive in 1917 and 1918 to injure his employer. There was nothing to gain by neglecting to co-operate with Rogers. On the contrary, the two of them had been promised by the Navy a substantial payment if com-

munication between submerged submarines was accomplished by March 1, 1918. The strong probability is that, had Rogers suggested the invention, Lyon would have tried it seriously and persistently, and not merely as an accidental experiment, quickly to be abandoned.

Therefore, notwithstanding the findings of the Court of Appeals and of two of the tribunals of the Patent Office, the evidence tending to show that Rogers conceived the invention before Willoughby and Lowell is not convincing to this court. The conclusions of the Assistant Commissioner of Patents seem more in accord with the testimony. However, it is not necessary to rest the decision on this point alone, for, under the rule, Rogers is not only required to show that his conception was prior to Willoughby and Lowell's, but also that, from the time of his conception until it was reduced to practice, he was using reasonable diligence in adapting and perfecting it.

Can it be said that from March 1, 1917, until January 10, 1919, when his patent application was filed, he pursued the idea with the diligence required of him under the circumstances? He contends that, since the device could only be reduced to practice upon a government submarine, the degree of diligence required of him was not so high as in the ordinary case. He urges that he performed his duty when he disclosed the idea to Lyon and asked him to perfect it, and that, since Lyon was an employee of the United States, the government is responsible for any neglect that ensued. Furthermore it is shown that on February 16, 1918, Rogers' brother requested of Lieutenant Commander Le Clair a report of the experiments in underground and underwater radio work. Le Clair replied that the work was progressing satisfactorily, and that, due to new receiving devices, the work of the antenna was showing constant improvement. Again, on April 12, 1918, after Lyon had referred Rogers to Le Clair, Rogers wrote Le Clair to inquire if Lyon had succeeded in sending and receiving, and, if so, how far; to which Le Clair, on April 20th replied that unfortunately Lyon had not had very great success with his experiments. This answer was the literal truth. These are the letters which the Court of Appeals regards as curt responses to Rogers' requests. Moreover the Court of Appeals holds that Rogers was excused from proceeding promptly with his patent application because, whatever may have been the technical obligation of secrecy imposed upon him by his contract with the government, he understood that it would be a breach of faith to file such an application during the war. Hence the delay for 22 months was excused.

There is very great weight in the suggestion that the character of the invention is such that a private citizen could not reduce it to practice without the co-operation of the government; but it is not the fact that the government refused to co-operate with Rogers. Lyon had been associated with Rogers by agreement between them before he was in any way employed by the United States. He was sent to New Orleans, New London, and Key West, because Rogers himself, by reason of his age, was unable to undergo the necessary hardships, and because Lyon was supposed to be the person most familiar with Rogers' inventions and his most satisfactory representative. Lyon unquestionably had the same opportunity to test various suggestions of radio communication on submarines, beginning in the summer of 1917, as was afforded to Willoughby and Lowell in the following year. If at any time Rogers was dissatisfied with the efforts that Lyon was putting forth, there is no question that somebody else could have been substituted in his place; but Rogers made no complaint to any officer of the United States as to Lyon's work or failure to co-operate.

As has already been pointed out, Rogers was widely acquainted with ranking officers of the Navy, and could readily have secured the performance of any test which he desired Lyon to try. Indeed, a memorandum in March, 1917, in the smaller notebook, shows that Rogers intended to tell Lieutenant Hooper about an idea and have him instruct Lyon to test it. It is true that Le Clair succeeded Hooper as the officer in charge of radio experiments in September, 1917; but there is every reason to believe that Le Clair was a faithful officer, eager to do everything possible to perfect radio communication with submarines. He welcomed suggestions from Willoughby and Lowell, two relatively unknown young men, who had been discouraged by their own superiors in the Bureau of Standards. It is only fair to assume that, had he been requested, he would have accorded like treatment to Rogers, whose standing and achievements had already received substantial recognition by the Navy. The excuse for the delay in filing the application for the patent, offered by the Court of Appeals, is also not tenable; for on January 17, 1918, Rogers filed two applications for patents upon underground and underwater devices, which have since been granted as patents No.

1,315,862 and No. 1,349,104. These inventions were particularly addressed to war purposes.

It is Rogers' position that he did not know that the device in issue had ever been tested upon a submarine when he instructed his attorney to apply for the patent in suit; that not only had he been kept in ignorance of Lyon's unsuccessful test at Key West on March 22, 1918, but he had received no information of the adoption of the Willoughby and Lowell device by the Navy, and first became aware of this installation on January 8, 1919. Therefore it is said on his behalf that he was not spurred into activity by the knowledge of Willoughby and Lowell's success, but spontaneously concluded that the invention was valuable and should be protected. But what excuse can now be offered for so tardy a resolution? The time was one of great emergency. The menace of the German submarine was uppermost in the minds of the civilized world. Many thousands were striving to minimize the danger. Momentarily some discovery might be made and disclosed. Rogers and Lyon had agreed to work upon the problem by a contract in which time was of the essence. If Rogers was in possession of the idea as early as March 1, 1917, as he now testifies and believes, how can he justify his gross neglect in reducing it to practice? May he wait until others later in conception, but more diligent in execution, have reduced it to practice and given it to the world? In harmony with the three tribunals of the Patent Office, this court finds that in any event Rogers delayed too long before he filed his patent application.

The rule of law has not been overlooked that the rulings of the Patent Office should be accepted as controlling on questions of fact, unless the contrary is established by testimony which in character and amount carried thorough conviction. Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 38 L. Ed. 657. The four preceding decisions in this case, however, are not in accord on all questions of fact, and the general finding of the three Patent Office tribunals differs from that of the Court of Appeals. It is more important that the case at bar was tried anew at great length and with great industry and skill by counsel on both sides. Eight days were consumed in presenting the testimony by question and answer taken in the Patent Office, and additional testimony as well. Moreover, the court has had the benefit of arguments, unlimited in time, and briefs, unlimited in space.

Notwithstanding the great respect due the decision of the higher court, the conclusion announced herein seems to be inevitable.